The **PEOPLE** of the State of Colorado, Plaintiff–Appellee,

v.

Michael **SHRECK**, Defendant–Appellant.

No. 02CA1413.

Colorado Court of Appeals, Div. III.

Sept. 23, 2004.

As Modified on Denial of Rehearing Nov. 10, 2004.

Certiorari Denied Feb. 28, 2005.

See also 22 P.3d 68.

Ken Salazar, Attorney General, Deborah Isenberg Pratt, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

C. Keith Pope, Boulder, Colorado; Nancy Holton, Boulder, Colorado, for Defendant–Appellant.

Opinion by Judge DAILEY.

Defendant, Michael Shreck, appeals the judgments of conviction entered upon jury verdicts finding him guilty of one count of second degree kidnapping and two counts of sexual assault. He also appeals his habitual offender adjudication. We affirm.

In 1990, a man knocked a young woman off her bike, tried to force her into the trunk of his car, and then took her to some nearby trees, where he sexually assaulted her both orally and vaginally at knifepoint. Although a sample of the perpetrator's semen was subsequently recovered in a rape kit examination of the victim, that sample was not subjected to deoxyribonucleic acid (DNA) testing until 1998. The testing resulted in a DNA match between the recovered semen sample and a sample of defendant's blood drawn in 1991 while he was in the custody of the Department of Corrections (DOC). Thereafter, the victim identified defendant as her assailant from a picture in a photo array and again at trial.

## I. DOC Collection of Defendant's DNA Sample

Defendant contends that the trial court erred in not suppressing the DNA sample collected by the DOC in 1991 and evidence derived therefrom. We disagree.

Defendant had been incarcerated in the DOC and then paroled in connection with convictions for burglary, robbery, and theft. His parole was revoked in 1991 after he was convicted in Minnesota of escape, robbery, unlawful possession of a firearm, and theft. Upon his return to the DOC, corrections officials drew a sample of his blood for analysis and use in a sex offender DNA database; they did so, based on (1) his admission that he had also been charged in Minnesota with a sexual offense involving a fifteen-year-old girl, and (2) information from his parole officer suggesting that the sexual offense had not been pursued because of the plea bargain reached with the Minnesota authorities.

Section 16–11–102.3(1.5) and (6), C.R.S. 2003, currently require that every felon sentenced to the DOC submit to the collection and chemical testing of a biological substance sample, for purposes of determining the felon's genetic markers and including them in a database maintained by the Colorado Bureau of Investigation. When the DOC collected defendant's sample in 1991, however, only offenders "convicted of an offense for which the factual basis involved a sexual assault" were required to submit to such testing, "[a]s a condition of parole." Colo. Sess. Laws 1988, ch. 121, § 17–2–201(5)(g)(I) at 701 (currently codified, with minor amendments, at § 17–2–201(5)(g)(I), C.R.S.2003).

Despite his admission to the contrary, defendant was never actually charged, much less convicted, of a sexual offense. Because defendant had not been convicted of an offense for which the factual basis involved a sexual assault, the trial court found that the statute was inapplicable. Nonetheless, the court determined that suppression was not warranted because the DOC officials had acted in good faith in drawing defendant's blood for use in a sex offender DNA database.

Defendant asserts that suppression is required because the DNA sample was obtained in violation of federal and state constitutional guarantees against unreasonable searches and § 17–2–201(5)(g)(I).

### A. Constitutional Issues

■ We reject defendant's assertion that the state could not collect and test a sample of his blood, consistent with constitutional search and seizure guarantees, in the absence of either a warrant supported by probable cause or individualized suspicion of wrongdoing.

Initially, we note that defendant made no argument either before the trial court or in this court as to why the state constitution should be applied any differently in this context than the federal constitution. We also note that the trial court did not, in its ruling, explicitly address any issues of state constitutional law. Under these circumstances, we presume the trial court applied federal law, and consequently, we resolve this issue solely on the basis of applicable federal constitutional standards. *See People v. Mershon,* 874 P.2d 1025, 1030 n. 2 (Colo.1994).

■ The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. A warrantless search or seizure is presumptively invalid unless justified by one of the established exceptions to the warrant requirement. *People v. Allison,* 86 P.3d 421, 426 (Colo.2004). One such exception is the "special needs exception." *Timm v. Reitz,* 39 P.3d 1252, 1256 (Colo.App.2001). Under that exception, neither a warrant, nor probable cause, nor even individualized suspicion of wrongdoing need be shown where "special needs, beyond the normal need for law enforcement" exist, and the search or seizure is found to be "reasonable" after balancing the government's special need against the individual's asserted privacy interests. *See Ferguson v. City of Charleston,* 532 U.S. 67, 74 n. 7, 121 S.Ct. 1281, 1286, 149 L.Ed.2d 205 (2001). Such a qualifying governmental need must be "important," "substantial," or "compelling" in nature before it may be considered special. *Timm v. Reitz, supra,* 39 P.3d at 1256.

We review de novo whether a search or seizure satisfies the requirements of the Fourth Amendment. *See People v. Matheny,* 46 P.3d 453, 461 (Colo.2002).

Statutes requiring the collection of blood samples for DNA identification purposes from persons convicted of crimes have been enacted by the federal government and all fifty states. *Green v. Berge,* 354 F.3d 675, 676 (7th Cir.2004); *see* 3 W. LaFave, *Search and Seizure* § 5.4(c), at n. 51.1 (3d ed. Supp.

2004). In some jurisdictions, the statutes require blood to be drawn from all convicted felons. *See Green v. Berge, supra* (analyzing Wisconsin statute); *Jones v. Murray,* 962 F.2d 302, 305–06 (4th Cir.1992)(analyzing Virginia statute). Here, defendant's blood was drawn from him while he was a prisoner in the DOC, as part of an effort to create a sex offender DNA database.

Every federal and state appellate court which has considered the issue has upheld against Fourth Amendment attack the collection of blood samples from convicts for use in assembling a DNA database. *See United States v. Kincade,* 379 F.3d 813, 830–31 (9th Cir.2004)(collecting cases).

The United States Supreme Court has applied the "special needs" rationale in the law enforcement context. *See Griffin v. Wisconsin,* 483 U.S. 868, 873–74, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987)("A State's operation of a probation system ... presents special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."; upholding warrantless search of probationers residence).

DNA databases serve a number of special needs beyond the normal need for law enforcement officials to secure evidence of a particular wrongdoing against a specific suspect. *See Green v. Berge, supra,* 354 F.3d at 676; *United States v. Kimler,* 335 F.3d 1132, 1146 (10th Cir.2003); *Roe v. Marcotte,* 193 F.3d 72, 79 (2d Cir.1999); *Vore v. United States Dep't of Justice,* 281 F.Supp.2d 1129, 1137 (D.Ariz.2003); *United States v. Sczubelek,* 255 F.Supp.2d 315, 319 (D.Del.2003); *State v. Martinez,* 276 Kan. 527, 78 P.3d 769, 775 (2003); *State v. Steele,* 155 Ohio App.3d 659, 802 N.E.2d 1127, 1137 (2003); *In re D.L.C.,* 124 S.W.3d 354, 373 (Tex.App.2003); *State v. Surge,* 94 P.3d 345, 349–50 (Wash.Ct. App.2004).

These authorities (collectively, the *Green–Surge* cases) recognize that, because DNA samples are analogous to fingerprints or palm prints, they can be used as generic identification tools. By enhancing the accuracy of the criminal justice system, DNA databases assist in exonerating the innocent, solving past as well as future crimes, and deterring recidivism.

In *United States v. Kincade, supra,* 379 F.3d at 838–39, the court recognized that these and other interests (namely, bringing closure to countless victims of past crime and sheltering society from future victimization) served by DNA databases are "undeniably compelling," even "monumental" in weight.

Compared to the normal citizen on the street, a prisoner has a substantially reduced expectation of privacy. *See Bell v. Wolfish,* 441 U.S. 520, 537, 559–60, 99 S.Ct. 1861, 1873, 1885, 60 L.Ed.2d 447 (1979)(noting that [l]oss of freedom of choice and privacy are inherent incidents of confinement and upholding suspicionless visual inspection of body cavity following contact with visitor to institution); *People v. Lee,* 93 P.3d 544, 547 (Colo.App.2003)(*cert. granted on other grounds* July 19, 2004) ("Prisoners have little, if any, reasonable expectation of privacy while incarcerated."); *see also Green v. Berge, supra,* 354 F.3d at 679–80 (Easterbrook, J., concurring)("Testing prisoners' blood, urine, saliva, or hair for drugs is routine and does not require individual suspicion.... Prisons, moreover, have a constitutional duty to attend to inmates' medical needs, and the discharge of this duty requires them to learn details about the inmates' medical conditions. That will entail the drawing of blood....").

When balanced against a prisoners greatly reduced expectation of privacy and the minimally intrusive nature of a blood draw, the significant governmental interests identified above have been found sufficient to justify suspicionless collection and testing of DNA samples from prisoners. *See Green–Surge* cases, *supra; see also United States v. Kincade, supra,* 379 F.3d at 840–41 (Gould, J., concurring); *cf. United States v. Kincade, supra,* 379 F.3d at 832, 839 (while recognizing that search could qualify as a "special needs" search, plurality upholds search based on a balancing of interests "reasonableness" inquiry); *Groceman v. United States Dep't of Justice,* 354 F.3d 411, 413–14 (5th Cir.2004)(foregoing special needs analysis, but upholding reasonableness of DNA database searches on balancing of interests grounds); *Jones v. Murray, supra,* 962 F.2d at 305–06 (same).

Finding these authorities and their reasoning persuasive, we conclude that the drawing of defendant's blood by the DOC for use in an offender DNA database did not contravene the requirements of the Fourth Amendment.

In so holding, we necessarily reject defendant's reliance on *United States v. Miles*, 228 F.Supp.2d 1130 (E.D.Cal.2002). In *Miles*, the court held that any need to establish DNA databases was a "normal" law enforcement need which would not satisfy the "special needs" exception. *United States v. Miles, supra,* 228 F.Supp.2d at 1138–39. However, *Miles* has been repudiated by most of the courts that have considered it. *See United States v. Kimler, supra,* 335 F.3d at 1146 n. 14; *Vore v. United States Dep't of Justice, supra,* 281 F.Supp.2d at 1135 n. 2; *State v. Martinez, supra,* 78 P.3d at 775; *In re D.L.C., supra,* 124 S.W.3d at 373 n. 12. The only appellate decision agreeing with *Miles, United States v. Kincade,* 345 F.3d 1095 (9th Cir.2003), was vacated by that court, sitting en banc; upon rehearing, the court upheld the suspicionless collection of a DNA sample from a prisoner. *See United States v. Kincade, supra,* 379 F.3d at 831 n. 25.

We also view as inapposite *People v. Williams,* 192 Colo. 249, 258, 557 P.2d 399, 406 (1976), which required a showing of clear indication that a search would yield relevant evidence before a blood draw was constitutionally permissible. In *Williams,* the person was suspected, *but not convicted,* of a crime. However, a suspect retains a greater expectation of privacy than does a convicted prisoner. *See Hudson v. Palmer,* 468 U.S. 517, 525–26, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984); *Bell v. Wolfish, supra,* 441 U.S. at 559–60, 99 S.Ct. at 1885.

## B. Statutory Violation

■ Defendant asserts that the DNA evidence and its fruits should nonetheless be suppressed because the DOC necessarily violated the relevant version of § 17–2–201(5)(g)(I) in drawing his blood to include in a DNA database. We conclude that, although the procedure was not authorized by statute, suppression is not warranted.

We agree with the trial court's finding that defendant did not fall within the purview of

the statute because he had not been convicted of a sexual assault or any offense for which the factual basis involved a sexual assault.

■ "In contrast to a constitutional violation, a statutory violation does not ordinarily require suppression of relevant evidence: '[S]uppression of evidence is a drastic remedy and is generally confined to violations of *constitutional* rights.'" *People v. Shinaut,* 940 P.2d 380, 383 (Colo.1997)(quoting, with approval, *People v. Bowers,* 716 P.2d 471, 473 (Colo.1986)); *see also People v. McKinstry,* 843 P.2d 18, 20 (Colo.1993)("[W]here an officer has obtained evidence in violation of a statute or regulation, the exclusionary rule is not triggered unless the unauthorized conduct also amounts to a constitutional violation.").

In *People v. Martinez,* 898 P.2d 28, 33 (Colo.1995), the supreme court stated that "willful and recurrent violations" of statutes could nonetheless trigger application of the exclusionary rule. Here, however, there is no indication in the record that corrections officials willfully violated the statute. To the contrary, the trial court found, with record support, that the officials acted in good faith based upon defendant's admissions to them that he had been charged with a sexual offense and upon other information suggesting the sexual offense played some role in the convictions underlying his parole revocation.

Defendant argues otherwise, asserting that DOC officials could have had no reasonable basis for believing they were authorized to collect a blood sample from a person who had not been convicted of a sex or sex-related offense. In this regard, however, defendant erroneously relies on the standard used when the Constitution has been violated. *See* § 16–3–308, C.R.S.2003 (codifying good faith, reasonable belief exception to the exclusionary rule); *People v. Saint–Veltri,* 935 P.2d 34, 37–38 (Colo.App.1996)(same), *rev'd on other grounds sub nom. People v. Blehm,* 983 P.2d 779, 794 (Colo.1999). A different standard applies when only a statute has been violated. *See People v. Martinez, supra,* 898 P.2d at 31 (not "willful").

Here, as indicated earlier, the Constitution was not violated by the DOC's collection of

defendant's blood sample. And because the DOC was not shown to have willfully violated the statute, we conclude that trial court properly denied defendant's motion to suppress the evidence.

## II. Right to Counsel and to Self–Representation

Defendant next contends that the trial court erred in denying his requests to receive replacement counsel or to proceed pro se. We are not persuaded.

■ An indigent defendant has a Sixth Amendment right to the assistance of appointed counsel in a criminal case. Although an indigent defendant has no right to demand a particular attorney, substitute counsel must be appointed where the defendant can establish a well-founded reason for believing that the currently appointed attorney cannot or will not provide adequate representation. *People v. Arguello*, 772 P.2d 87, 94 (Colo.1989).

■ Here, the record reflects that, on several occasions, defendant asked to have his public defenders replaced and that the court ultimately replaced them with conflict-free counsel. Consequently, we perceive no error in the delay, rather than denial, of defendant's request for other counsel.

■ A defendant also has the right of self-representation. The right must be timely and unequivocally asserted, *People v. Mogul*, 812 P.2d 705, 709 (Colo.App.1991), and it may not be exercised until the defendant first effects a valid (that is, a voluntary, knowing, and intelligent) waiver of counsel. *People v. Arguello, supra*, 772 P.2d at 92–94.

■ Defendant made several requests to represent himself. However, on a number of occasions, his requests were secondary to his requests for the assistance of conflict-free counsel. Thus, we conclude they were not unequivocal.

Defendant made two requests to represent himself while trial proceedings were stayed pending the People's original proceeding before the supreme court challenging the trial court's exclusion of expert DNA evidence. *See People v. Shreck*, 22 P.3d 68 (Colo.2001)(holding such evidence admissible under CRE 702). The stay encompassed issues relating to defendant's representation in that the supreme court denied defendant's motion to partially lift the stay to address those issues in the trial court. *See* C.A.R. 21(g)(2) ("Issuance of a rule to show cause by the Supreme Court automatically stays *all* proceedings below until final determination of the original proceeding in the Supreme Court unless the court, sua sponte, or upon motion, lifts such stay in whole or in part.")(emphasis added).

At one point, defendant also moved to dismiss counsel and represent himself so that he could gain greater access to a law library in connection with his dissolution of marriage case, a small claims action, and a civil rights action against the Boulder Police Department. The court did not abuse its discretion in denying this request, however, because defendant's pro se status would not have entitled him to greater access to a law library in connection with his civil cases. *See Lewis v. Casey*, 518 U.S. 343, 355, 116 S.Ct. 2174, 2182, 135 L.Ed.2d 606 (1996)(inmates are not constitutionally entitled to access a law library for civil matters that have no bearing on their incarceration); *see also United States v. Taylor*, 183 F.3d 1199, 1205 (10th Cir.1999)(criminal defendants who elect to waive counsel and proceed pro se are not thereby automatically entitled access to a law library under Sixth Amendment).

Finally, defendant argues that he also asked to represent himself when the court discharged his public defenders and appointed replacement counsel for him. At that time, defendant indicated that, although he desired the assistance of replacement counsel, he wanted to make all the final decisions himself. The trial court started to apprise him, in accord with *People v. Arguello, supra*, of his right to represent himself and of the consequences of exercising that right. However, before finishing the advisement, the court asked whether he would be willing to talk to replacement counsel before making a final decision about representing himself, and defendant agreed to do so.

Thereafter, during the next year leading up to trial, defendant never again raised the matters of replacement of counsel or self-representation. Under the circumstances,

**1056**

we conclude that defendant did not make an unequivocal request for self-representation. *See People v. Edwards,* 101 P.3d 1118, 2004 WL 1575250 (Colo.App. No. 02CA2487, July 15, 2004)(no explicit request to proceed pro se where a defendant conferred with replacement counsel, did not express dissatisfaction with his new attorney, and did not subsequently seek either replacement counsel or self-representation).

Thus, we perceive no error in the trial court's rulings related to defendant's request for replacement counsel or self-representation.

### III. Uniform Mandatory Disposition of Detainers Act

■ Defendant contends that the trial court erred in not dismissing his case because of a violation of the Uniform Mandatory Disposition of Detainers Act (UMDDA), § 16–14–101, et seq., C.R.S.2003. We disagree.

■ The UMDDA controls the disposition of detainers within the State of Colorado and guarantees a defendant in a criminal case the right to a speedy trial. *People v. Higinbotham,* 712 P.2d 993, 995 (Colo.1986).

■ Ordinarily, once a defendant has invoked the UMDDA, his or her trial must be held within the ninety-day period set forth in 16–14–104(1), C.R.S.2003, or the charges must be dismissed with prejudice. *People v. Naulls,* 937 P.2d 778, 780 (Colo.App.1996).

■ However, "[a] defendant may waive his or her right to a speedy trial under the UMDDA expressly or by affirmative conduct, such as by participating in setting the trial date outside of the speedy trial provisions" or expressly consenting to the delay. Further, "[w]here motions are made for a defendants benefit, any reasonable time necessitated by such motions, including continuances, extends the speedy trial limit." *People v. Garcia,* 17 P.3d 820, 823 (Colo.App. 2000); *see also People v. Anderson,* 649 P.2d 720, 723 (Colo.App.1982)(same); *cf. People v. Swazo,* 199 Colo. 486, 490, 610 P.2d 1072, 1075 (1980)(UMDDA "permits only one continuance *by the People*" (emphasis added)).

Defendant was tried in May 2002. In their primary briefs before this court, the parties agreed that an earlier scheduled October 2001 trial date fell within the applicable UMDDA period, and that the period from February 4, 2002, until trial was properly chargeable to defendant. However, defendant asserted that, by February 4, 2002, the speedy trial provisions of the UMDDA had already expired.

In September 2001, alleging that she needed more time to prepare for trial, defense counsel submitted a motion for continuance of the October trial date to "a date that is convenient to all parties." Attached to the motion was a hand-written statement from defendant indicating he was waiving his right to speedy trial "for the purposes of this continuance."

At the hearing on the motion, defense counsel indicated that she was available to try the case in December, at a date that would have fallen within the UMDDA period. However, the prosecutor was not otherwise available until January 2002, and the court's next available date was February 4, 2002. Defense counsel indicated that she had the February 4 date open, and defendant, who appeared via telephone, voiced no objection to continuing the trial to that date.

Under these circumstances, we conclude that the applicable UMDDA period was tolled by defendant's request for a continuance to allow his counsel to prepare for trial, and by his participating, both personally and through counsel, in setting the February 4, 2002 trial date. *See Garcia, supra; cf. People v. Anderson, supra,* 649 P.2d at 723 (defense counsel need not get defendant's approval for continuance in order for UMDDA to be tolled). Thus, because the period was properly tolled and chargeable to defendant, we reject his assertion that his trial was held outside the UMDDA period.

Defendant's reliance on *People ex. rel. Gallagher v. District Court,* 933 P.2d 583 (Colo.1997), is misplaced. In *Gallagher,* the supreme court stated that an explicit waiver by a defendant tolls the UMDDA. *Gallagher, supra,* 933 P.2d at 588. Additionally, in *Gallagher,* the court continued the case and appointed new counsel on the eve of trial over the defendant's objection. Conversely here, a continuance was granted to accommo-

date a request made by existing counsel with whom defendant had been working, and defendant assented to it.

We decline to consider further arguments raised for the first time in defendant's reply brief. *See People v. Copenhaver,* 21 P.3d 413, 419 (Colo.App.2000).

In sum, we conclude that the trial court did not err in refusing to dismiss the case for asserted violations of the UMDDA.

## IV. Jury Selection

■ Defendant next contends that the trial court erred in denying his challenges for cause to two jurors who, he asserts, were exposed to inherently prejudicial information through various newspaper accounts about his case. We are not persuaded.

Section 16–10–103(1)(j), C.R.S.2003, requires a trial court to sustain a challenge for cause if a juror's state of mind evinces enmity or bias toward the defendant or the state. Similarly, Crim. P. 24(b)(1)(X) requires disqualification of a juror if his or her state of mind manifests a bias for or against the defendant or the prosecution, or if the juror acknowledges a previously formed or expressed opinion regarding the guilt or innocence of the defendant, unless the court is satisfied that the juror will render an impartial verdict based solely upon the evidence and instructions of the court. *See Morrison v. People,* 19 P.3d 668, 672 (Colo.2000).

■ Great deference is given to the trial court's determination of a challenge for cause, because such decisions turn on an assessment of the juror's credibility, demeanor, and sincerity in explaining his or her state of mind. The trial court is in a better position to evaluate these factors than a reviewing court. Therefore, a reviewing court will overturn a trial court's decision concerning a challenge for cause only upon an affirmative showing that the court abused its discretion. *Carrillo v. People,* 974 P.2d 478, 484–85 (Colo.1999)(in reviewing denial of challenge for cause, appellate court must examine the entire voir dire of the prospective juror).

Here, during questioning in chambers, two jurors recalled reading news accounts referencing the fact that defendant's DNA sample had been obtained while imprisoned on an unrelated matter. Although there was some indication that one juror may have disregarded a recent instruction by the court not to read news accounts of this case, defendant challenged both jurors based only upon their extrajudicial knowledge about defendant's prior incarceration.

The trial court denied the two challenges, finding, with record support, that both jurors had specifically committed themselves to putting aside what they had read, not telling the other jury members about it, and rendering a fair and impartial verdict based only on the evidence presented at trial.

The trial court did not abuse its discretion in determining that the effect of the information on the prospective jurors was not so great as to interfere with their ability to render an impartial verdict. *See People v. Bashara,* 677 P.2d 1376, 1378 (Colo.App. 1983)("[A] prospective juror's reading of a newspaper article making reference to a prior conviction of the defendant does not automatically disqualify that prospective juror if, as here, the juror states that he can and will set aside what was read and render an impartial verdict according to the evidence and the law."); *cf. People v. McCrary,* 190 Colo. 538, 547, 549 P.2d 1320, 1327 (1976)(upholding denial of challenges for cause to jurors who had been exposed to news articles before trial indicating defendant may have committed as many as twenty-two murders).

Defendant erroneously relies on *Salas v. People,* 177 Colo. 264, 493 P.2d 1356 (1972), and *People v. Moore,* 701 P.2d 1249 (Colo. App.1985). In *Salas,* a witness testified during trial about a news account which revealed that the defendant had previously been convicted of the very crime for which he was then being retried. *Salas v. People, supra,* 177 Colo. at 265–66, 493 P.2d at 1357. In *Moore,* a division of this court upheld the trial court's discretion in ordering a mistrial sua sponte when the bailiff informed a deliberating jury that defendant had been stabbed while incarcerated on a prior offense. Several jurors were upset by this information; one told the court that the information would definitely influence her decision in the case. *People v. Moore, supra,* 701 P.2d at 1252–53.

The present case is readily distinguishable from these cases because (1) defendant was not being retried on any charge; (2) the trial court was aware of the problem in time to take precautionary measures; (3) the trial court was able to appraise the jurors' credibility, sincerity, and commitment to giving defendant a fair trial before trial began; and (4) there is record support for the court's finding that the jurors could be fair and impartial.

Defendant nonetheless argues that the jurors had to be excused because the information to which they were exposed (namely, that he had been incarcerated) would necessarily have prejudiced them with respect to the habitual offender charges in the case. Notwithstanding that defendant never presented this argument to the trial court, it is sufficient to note that even "the best qualified jurors will have heard or read something about [an important criminal] case ... It is therefore sufficient if jurors can lay aside the information and opinions they have received through pretrial publicity." *People v. McCrary, supra,* 190 Colo. at 545, 549 P.2d at 1325 (jurors exposed to facts of case by media coverage).

Under the circumstances, we conclude that the trial court did not abuse its discretion in denying defendant's challenges for cause.

### V. Jury Inquiry

Defendant contends that reversal of his second degree kidnapping conviction is required because the trial court did not answer an inquiry from the jury regarding the asportation element of the crime. We disagree.

The trial court had instructed the jury that, to convict defendant of second degree kidnapping, it had to find, with respect to the asportation element of the crime, that defendant "seized and carried any person from one place to another."

During deliberations, the jury sent out a note asking the court to "[c]larify the word *carried* ... What does it mean? What does it imply? How broad is the definition[?]"

Defendant asked the court to inform the jury that the crime of second degree kidnapping required movement that was more than merely incidental to the sexual assault in this case. This, however, would have been an incorrect statement of the law. *See People v. Owens,* 97 P.3d 227, 236 (Colo.App.2004)(movement incidental to another crime may nonetheless qualify as second degree kidnapping); *People v. Bell,* 809 P.2d 1026, 1033 (Colo.App.1990)(same).

Defendant was willing to have the jury told that, as one prosecutor suggested, "[p]roof of an increased risk [of harm] ... is a factor that the jury can consider [in determining] whether movement has occurred." *See People v. Harlan,* 8 P.3d 448, 477–78 (Colo.2000)(increased risk of harm is not an element of second degree kidnapping, but in cases of relatively insubstantial movement, an increased risk of harm may be relevant to determining whether victim has been moved from one place to another). Ultimately, however, the parties disagreed on the substantive response the court should give, and the court informed the jury simply that it was "unable to answer [the] question at this time."

On appeal, defendant argues that the trial court was required, under *Leonardo v. People,* 728 P.2d 1252, 1258 (Colo.1986), to respond with a substantive answer to the jury's question, because the question demonstrated that the jury misunderstood the instructions it had received. Defendant does not, however, assert what instruction should have been given, other than the incorrect one he originally tendered to the court.

We perceive no reversible error. Unlike in *Leonardo,* there was no indication here that the jury misunderstood the meaning of the term "carried," was in danger of misapplying that term in a manner prejudicial to defendant's interests, or was focused on "carried" to the exclusion of the additional requirement that the carrying be "from one place to another." Nor was there any indication that the jury's concern had anything to do with the distance a victim had to be moved before a second degree kidnapping was committed.

The text of the question suggests that the jury was concerned with how literally it should apply the term "carried," that is, whether the crime could only be committed by physically picking the victim up and car-

rying her somewhere else. Because any misunderstanding on this point could only have inured to defendant's benefit, *see People v. Harlan, supra,* 8 P.3d at 476–77 (discussing asportation element of second degree kidnapping), no reversible error resulted from the trial court's decision not to substantively respond to the jury's inquiry. *See People v. Shields,* 822 P.2d 15, 22 (Colo.1991)(because error in instruction could only have inured to defendant's benefit, error was harmless).

### VI. Habitual Criminal Proceedings

We likewise reject defendant's contentions challenging the validity of his habitual criminal adjudication.

### A. Use of Prior Guilty Pleas

■ Defendant asserts that the prosecution was barred from introducing evidence of his 1983 and 1986 criminal convictions because of the plea agreements reached in those cases. We disagree.

Initially, we reject the People's assertion that defendant's contention is time barred under the collateral attack limitations statute, § 16-5-402, C.R.S.2003. The peculiar nature of defendant's challenge here could not have been raised until after an alleged breach of the plea agreement occurred. In this case, such a breach would have occurred when the prosecution first attempted to use the convictions to support an enhanced sentence for defendant.

■ With respect to the merits, the interpretation of a plea agreement is a question of law subject to de novo review. "We interpret plea agreements pursuant to an objective standard, focusing on the meaning a reasonable person would have attached to the agreement under the circumstances." *People v. Johnson,* 999 P.2d 825, 829 (Colo. 2000); *see also People v. Manzanares,* 85 P.3d 604, 608 (Colo.App.2003).

Thus, we must determine here whether, when viewed objectively, the circumstances are such as would lead a reasonable person to believe that the prosecution promised not to use the resulting convictions to enhance any future sentence. *See generally Craig v. People,* 986 P.2d 951, 960–61 (Colo.1999).

In the trial court, defendant did not allege that the prosecutors had affirmatively made a promise to him. Rather, he argued only that he had agreed to plead guilty in return for stipulated sentences in those cases and that the state had not advised him in connection with his plea agreement that his pleas could be used to enhance a future sentence.

■ A trial court need not advise a defendant about the possible use of a guilty plea in future proceedings. *People v. Birdsong,* 958 P.2d 1124, 1128 (Colo.1998); *People v. Heinz,* 197 Colo. 102, 106, 589 P.2d 931, 933–34 (1979). Nor is the prosecutor, as the representative of an adverse party, obliged to do so.

Absent such a duty, we do not believe that a reasonable person would interpret the prosecutor's silence on this subject as an implied promise to refrain from pursuing legally appropriate punishment in connection with any future misconduct by defendant. *Cf. Benavidez v. People,* 986 P.2d 943, 948 (Colo.1999)(where parties spoke in terms of a sentence to the "Department of Corrections" or the "D.O.C.," promise concerned only the confinement, and not the parole, component of a sentence).

Thus, we reject defendant's argument that the use of these prior convictions to support his habitual criminal adjudication violated the plea agreements reached in those cases.

### B. Evidence of Uncharged Criminality

■ We also reject defendant's assertion that the trial court should have declared a mistrial during the habitual criminal proceedings because of a reference to uncharged criminality.

During the habitual criminal phase of trial, an investigator compared the fingerprints he had taken from defendant with those located in the DOC's penitentiary pack and in records obtained from Oregon. During the investigator's testimony, the People sought to introduce a posterboard exhibit showing blow-ups of various fingerprints from the DOC "pen pack" and the Oregon records.

During voir dire concerning this exhibit, defendant discovered that two of the prints depicted on the posterboard originated from arrest records in cases which were never brought to trial in Oregon. The trial court

denied defendant's ensuing motion for mistrial, but also excluded the posterboard exhibit. The court further offered to provide the jury with a curative instruction, but defendant declined that offer.

■■■■ A mistrial is a drastic remedy that is warranted only where the prejudice to the defendant is too substantial to be remedied by other means. *People v. Copenhaver, supra,* 21 P.3d at 417. A trial court has broad discretion to grant or deny a mistrial, and its decision will not be disturbed on appeal absent a gross abuse of discretion and prejudice to the defendant. *People v. Abbott,* 690 P.2d 1263, 1269 (Colo.1984).

■■■ "Although it is necessary under the habitual criminal statute to prove prior convictions, earlier charges which do not result in convictions are irrelevant" in habitual criminal proceedings. *People v. Bernabei,* 979 P.2d 26, 30 (Colo.App.1998). However, a mistrial is not automatically required simply because some reference was made to other inadmissible bad act evidence. *See People v. Vigil,* 718 P.2d 496, 505 (Colo.1986)(discussing references to uncharged crime evidence in substantive crime phase of case).

■■■ "It is well established that error in admitting evidence may be cured by instructing the jury to disregard it unless such evidence is so prejudicial that the jur[ors] will unlikely be able to erase it from their minds." *Edmisten v. People,* 176 Colo. 262, 276, 490 P.2d 58, 65 (1971).

Here, the reference to defendant's uncharged crimes was brief, almost immediately suppressed by the court, and not repeated again in front of the jury. The reference did not identify the nature of the charges, and the trial court offered a curative instruction, which offer defendant declined. Under these circumstances, we perceive no abuse of discretion in the trial court's denial of defendant's motion for mistrial. *See People v. Lowe,* 184 Colo. 182, 189, 519 P.2d 344, 347–48 (1974); *see also People v. Lawson,* 37 Colo.App. 442, 446, 551 P.2d 206, 210 (1976)(mistrial not required in connection with evidence that witness knew defendant previously from "county jail" where evidence was not intentionally elicited by prosecution and curative instruction was given); *cf. People v. Bernabei, supra,* 979 P.2d at 30 (even

the improper admission of other crimes evidence in habitual phase of trial would not require reversal, where ample evidence of defendant's prior convictions existed and jury was otherwise properly instructed with respect to the evidence).

Defendant's reliance on *People v. Lucero,* 200 Colo. 335, 344, 615 P.2d 660, 666 (1980), is misplaced. Unlike here, in *Lucero,* improper reference was continually made to inadmissible other crimes evidence throughout both the guilt and sentencing phases of trial.

### C. Confrontation Clause

■■■ Defendant also argues that the admission of documentary evidence showing his prior convictions violated his Sixth Amendment right to confrontation, in violation of the Supreme Court's recent pronouncement in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We are not persuaded.

■■■ Under *Crawford,* a testimonial statement of a declarant who does not testify at trial is inadmissible unless (1) the declarant is unavailable and (2) the defendant had a previous opportunity to cross-examine the declarant. *Crawford v. Washington, supra,* —— U.S. at ——, 124 S.Ct. at 1369.

Although the *Crawford* Court did not precisely define "testimonial" statements, it excluded business records from that category. *See Crawford, supra,* —— U.S. at ——, 124 S.Ct. at 1367. Because public records are analogous to business records, *see People v. Selassie,* 532 N.Y.S.2d 326, 328 (N.Y. Sup. Ct. 1988), public records should not be considered "testimonial" statements for purposes of applying *Crawford.* The DOC pen pack and Oregon documents challenged here are official records, *see People v. Tenorio,* 197 Colo. 137, 143, 590 P.2d 952, 956 (1979); *United States v. Dancy,* 861 F.2d 77, 80 (5th Cir. 1988)(fingerprint card admissible as public record under FRE 803(8)), of a type not subject to the requirements of *Crawford.*

Nor are the affidavits of judges and court clerks accompanying those documents subject to *Crawford* requirements. *Crawford* applies to out-of-court statements by wit-

nesses who would have testified at trial to past events or facts, but are attempting to testify ex parte through an affidavit in lieu of live testimony. *See People v. Compan,* 100 P.3d 533, 2004 WL 1123526 (Colo.App. No. 02CA1469, May 20, 2004)(*cert. granted* Oct. 25, 2004).. In contrast, the affidavits at issue here were provided solely to verify the chain of custody and authenticity of the underlying documentary evidence. It is the underlying documentary evidence, and not the authenticating affidavits, that reference (and are thus used to prove) the facts material to habitual criminal proceedings, namely, a defendant's prior convictions.

Accordingly, the judgments of conviction and sentence are affirmed.

Judge TAUBMAN and Judge GRAHAM concur.