2015 COA 93

**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellee,**

**v.**

**Gejuan Levar LANCASTER,**
**Defendant–Appellant.**

**Court of Appeals No. 12CA0791**

Colorado Court of Appeals,
Div. VII.

Announced July 16, 2015

Cynthia H. Coffman, Attorney General, Erin K. Grundy, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Douglas K. Wilson, Colorado State Public Defender, Nathaniel E. Deakins, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE GABRIEL

¶ 1 Defendant, Gejuan Levar Lancaster, appeals the judgment of conviction and sentence on a jury verdict finding him guilty of kidnapping, two counts of sexual assault, menacing, and third degree assault. We conclude that the trial court did not err in (1) denying Lancaster's motion to suppress a DNA profile that he contends resulted from a violation of his rights under the United States and Colorado Constitutions and (2) denying without an evidentiary hearing his motion to allow evidence that the victim had a history of making false allegations of sexual assault. We further conclude that the record is not sufficiently developed for us to determine whether the trial court misperceived the applicable sentencing range for Lancaster's sexual assault counts. Accordingly, we

affirm the judgment, vacate the sentences on the sexual assault counts, and remand for resentencing on those counts.

## I. Background

¶ 2 Late one evening in November 2009, a man approached the victim on a street after the victim had left a friend's apartment. After following her for a time, the man walked up to the victim, wrapped his arm around her neck, and said, "Come here girl." She screamed, and he told her that he had a gun and that if she did not stop screaming, he would shoot her in the head. He then forced her into a field and sexually assaulted her. During the assault, she felt what she thought was a gun in the man's jacket pocket. After the man left, the victim went to a nearby home, and the residents let her in and called 911. A DNA swab was subsequently taken from the victim, and the resulting DNA profile was uploaded to both a Colorado database and the Combined DNA Index System (CODIS) national DNA database.

¶ 3 As a result of the above-described assault, the People charged Lancaster with numerous counts of kidnapping, sexual assault, menacing, and third degree assault. The case proceeded to trial, where Lancaster presented a misidentification defense. The jury convicted him as charged, and the trial court sentenced him, as pertinent here, to an indeterminate prison term of twenty-five years to life on the sexual assault counts, both of which were class two felonies.

¶ 4 Lancaster now appeals.

## II. DNA Evidence

¶ 5 Lancaster contends that the trial court erred in denying his motion to suppress DNA evidence that he asserts was developed as a result of violations of his federal and state constitutional rights. We perceive no basis for reversal.

### A. Pertinent Facts

¶ 6 Although the record is not entirely clear, it appears that in October 2010, approximately one year after the sexual assault at issue, Lancaster was arrested on a warrant for the revocation of his deferred sentence on a prior misdemeanor harassment charge. That deferred sentence had been imposed as part of a plea bargain in a case in which Lancaster was initially facing felony charges. Apparently because Lancaster's criminal history erroneously indicated that he had been convicted of a felony in that case, the police took a buccal swab of Lancaster's mouth.

¶ 7 Several months later, Lancaster was again arrested, this time in connection with apparent traffic violations. The police took another buccal swab at that time.

¶ 8 Two days after the police took this swab, Lancaster was arrested on a felony robbery charge.

¶ 9 Subsequently, the above-described buccal swabs were tested, and the analysis of at least the first sample resulted in a match with the DNA profile of the man who had sexually assaulted the victim in this case. Based on this initial match, the police obtained an order pursuant to Crim. P. 41.1 to collect another DNA sample from Lancaster. They did so, and the analysis of this sample also resulted in a match with the DNA profile of the man who had sexually assaulted the victim.

¶ 10 Prior to trial, Lancaster filed a motion to suppress the DNA profile developed after the police had obtained the Crim. P. 41.1 order and collected the third DNA sample from him. He asserted that the ultimate match resulted from a DNA sample taken in violation of (1) Katie's Law, §§ 16–23–101 to –105, C.R.S.2014; (2) the Fourth Amendment of the United States Constitution; and (3) article II, section 7 of the Colorado Constitution.

¶ 11 After a hearing, the trial court denied this motion. Although the court found that the police had violated Katie's Law when they took the first two samples, it found no evidence of bad faith or malice and further concluded that the warrantless collection of Lancaster's DNA fell within the "special needs" exception to the warrant requirements of the United States and Colorado Constitutions.

### B. Discussion

¶ 12 When reviewing a trial court's order on a motion to suppress, we defer to

the court's factual findings but review de novo its ultimate legal conclusion as to whether the defendant's constitutional rights were violated. *People v. Brunsting*, 2013 CO 55, ¶ 15, 307 P.3d 1073, 1078.

¶ 13 Section 16–23–103(1)(a) provides that an arresting law enforcement agency shall, as part of its booking process, collect a biological sample from any adult arrested on or after September 30, 2010 for a felony offense or for the investigation of a felony offense.

¶ 14 In addition, "[t]he Fourth Amendment to the United States Constitution and article II, § 7 of the Colorado Constitution protect against unreasonable searches and seizures." *People v. Rossman*, 140 P.3d 172, 174 (Colo.App.2006). A cheek swab to obtain a DNA sample is a search, and a search without a warrant supported by probable cause is presumptively unreasonable unless it falls within one of the established exceptions to the warrant requirement. *People v. Casillas*, 2015 COA 15, ¶ 23, —— P.3d ——.

¶ 15 The so-called "special needs" exception is one such exception. *Rossman*, 140 P.3d at 174.

> Under that exception, a warrant, probable cause, or even individualized suspicion of wrongdoing need not be shown where "special needs, beyond the normal need for law enforcement" exist, and the search or seizure is found to be "reasonable" after balancing the government's special need against the individual's asserted privacy interests.

*Id.* (quoting *People v. Shreck*, 107 P.3d 1048, 1052 (Colo.App.2004)).

¶ 16 DNA databases serve a number of special needs beyond the need of law enforcement officials to secure evidence of wrongdoing against a particular suspect. *Shreck*, 107 P.3d at 1053. "By enhancing the accuracy of the criminal justice system, DNA databases assist in exonerating the innocent, solving past as well as future crimes, and deterring recidivism." *Id.*

¶ 17 Weighed against the government's special need is the individual's asserted privacy interests. *See Rossman*, 140 P.3d at 174.

¶ 18 As pertinent here, the privacy expectations of a suspect who is taken into custody are diminished. *See Maryland v. King*, —— U.S. ——, 133 S.Ct. 1958, 1978, 186 L.Ed.2d 1 (2013). Thus, at the station house, police officers may search the suspect's person and the property in his or her immediate possession. *Id.* Moreover, the search of the suspect's person may be relatively extensive, requiring, for example, some detainees to lift their genitals or cough in a squatting position. *Id.* As the United States Supreme Court has observed:

> DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.

*Id.* at ——, 133 S.Ct. at 1980.

¶ 19 Similarly, courts have recognized that people under the supervision of the probation department may have diminished privacy interests. *See Casillas*, ¶¶ 25, 27–34, —— P.3d at —— (considering the privacy interests of a juvenile on a deferred adjudication); *Rossman*, 140 P.3d at 175–76 (considering the privacy interests of a probationer). People under the supervision of the probation department do not enjoy the liberty to which other citizens are entitled but only liberty that is conditioned on the observance of certain restrictions. *See Rossman*, 140 P.3d at 175–76.

¶ 20 And in considering an individual's privacy interests, the Supreme Court has noted that "the intrusion of a cheek swab to obtain a DNA sample is a minimal one." *King*, —— U.S. at ——, 133 S.Ct. at 1977. It does not break the skin and involves virtually no risk, trauma, or pain. *Id.* at ——, 133 S.Ct. at 1979.

¶ 21 Here, DNA samples were taken from Lancaster after he was arrested on a warrant for the revocation of a deferred sentence on a misdemeanor harassment charge and also when he was arrested for misdemeanor traf-

fic offenses. Because neither of the crimes for which Lancaster was arrested was a felony, the parties agree, as do we, that Katie's Law did not authorize the taking of these samples. *See* § 16–23–103(1)(a). For several reasons, however, we nonetheless conclude that these searches did not require the suppression, under the United States or Colorado Constitutions, of the DNA evidence that was developed after the police had obtained a warrant.

¶ 22 First, evidence seized as a result of a statutory violation does not ordinarily require suppression, unless the seizure was willful and recurrent. *Casillas*, ¶ 19, —— P.3d at ——. Lancaster does not argue, nor would the record support a conclusion, that the violation of Katie's Law was willful and recurrent.

¶ 23 Second, the record and the above-cited case law demonstrate that the government's interest in the DNA sample was not outweighed by Lancaster's privacy interests. This is particularly true in this case, where (1) Lancaster was a suspect taken into custody, *see King*, —— U.S. at ——, 133 S.Ct. at 1978; (2) he was under the supervision of the probation department when the first sample was taken, *cf. Rossman*, 140 P.3d at 175–76; and (3) the intrusion into Lancaster's privacy resulting from the buccal swabs was minimal and akin to booking procedures like the fingerprinting and photographing of a suspect, *see King*, —— U.S. at ——, 133 S.Ct. at 1977, 1980. Accordingly, we perceive no Fourth Amendment violation here.

¶ 24 Third, notwithstanding Lancaster's assertion to the contrary, the state constitution provides the same, not greater, protection in this area than the Fourth Amendment. *See Rossman*, 140 P.3d at 176 (rejecting the defendant's argument that the Colorado Constitution provides greater protections to probationers than does the United States Constitution).

¶ 25 Accordingly, we conclude that the trial court did not err in denying Lancaster's motion to suppress the DNA profile that was allegedly developed as a result of the prior warrantless collections of DNA evidence from him.

¶ 26 We are not persuaded otherwise by Lancaster's argument that the search here

was unconstitutional because Lancaster was only in custody for misdemeanor offenses. Although in *King*, —— U.S. at ——, 133 S.Ct. at 1980, the Supreme Court concluded that it was constitutional to collect DNA from a suspect detained in custody for a "serious offense," the Court did not hold that it is unconstitutional to take DNA from arrestees under all other circumstances. *See People v. Marquez*, No. G048762, 2015 WL 292310, at *5 (Cal.Ct.App. Jan. 21, 2015) (unpublished opinion) ("While the Supreme Court in [*King*] was addressing a statute that specified DNA samples could be processed only after an arrestee had been arraigned, and the court found the statutory procedure constitutional, the court did not state that the collection and processing of DNA samples is unconstitutional in all other contexts.") (*review granted* Apr. 29, 2015). Moreover, as the Ninth Circuit recently observed, "Under the Court's rationale [in *King*], the magnitude of the state's interest does not necessarily depend on the seriousness of the crime of arrest. As the majority [in *King*] observed, 'people detained for minor offenses can turn out to be the most devious and dangerous criminals.'" *Haskell v. Harris*, 745 F.3d 1269, 1273 (9th Cir.2014) (quoting *King*, 133 S.Ct. at 1971).

¶ 27 Nor are we persuaded by Lancaster's argument that the search here was unreasonable because Katie's Law has the express purpose of solving and preventing crime, while the *King* Court stated that the Maryland statute at issue in that case was concerned with processing and identifying people taken into custody. *See King*, —— U.S. at ——, 133 S.Ct. at 1970. The statute at issue in *King* did not expressly say that identification was its sole governmental interest. *See* Md.Code Ann., Pub. Safety § 2–505 (West 2015). Nor did the Supreme Court say that identification is the *only* legitimate governmental interest served by collecting DNA samples. Indeed, a division of this court recently identified other governmental interests in collecting DNA samples, including interests similar to those identified in Katie's Law. *Compare Casillas*, ¶ 26, —— P.3d at —— (noting that the government's special needs in collecting DNA samples from probationers include exonerating the

innocent, solving past and future crimes, deterring recidivism, and reintegrating probationers into the community), *with* § 16–23–102, C.R.S.2014 (providing that (1) the collection and use of DNA is a valuable tool in preventing crime; (2) the analysis of DNA has been used to exonerate innocent individuals charged with or convicted of crimes; and (3) the implementation of Katie's Law will result in preventing a significant number of violent crimes and in solving a number of unsolved crimes in Colorado).

¶ 28 And we see nothing in *People v. Williams*, 192 Colo. 249, 557 P.2d 399 (1976), on which Lancaster relies, that suggests that the Colorado Constitution provides greater protection in this area than the Fourth Amendment.

¶ 29 Finally, we acknowledge that in *Casillas*, ¶ 27, —— P.3d at ——, the division concluded that a juvenile on a deferred adjudication has a greater expectation of privacy with respect to DNA collection than a juvenile probationer. This conclusion, however, does not assist Lancaster, who had been arrested on a warrant for revocation of his prior deferred sentence when the first DNA sample was taken from him. In *Casillas*, "there [was] no evidence that Casillas' juvenile probation officer had reasonable suspicion to believe that Casillas violated any terms of his juvenile probation while on the deferred adjudication." *Casillas*, ¶ 31, —— P.3d at ——. This fact, when read together with the juvenile DNA collection statute there at issue, led the division to conclude that the state's interest did not outweigh the juvenile's privacy interest. *Id.* at ¶¶ 27–34, —— P.3d at ——. In this case, in contrast, it was undisputed that Lancaster had violated the terms of his deferred sentence.

### III. Rape Shield Evidence

¶ 30 Lancaster next contends that the trial court abused its discretion and violated his constitutional right to present a defense when it denied without an evidentiary hearing his motion to allow him to introduce evidence that the victim had a history of making false allegations of sexual assault. We are not persuaded.

### A. Pertinent Facts

¶ 31 Prior to trial, Lancaster filed a motion pursuant to Colorado's rape shield statute, § 18–3–407, C.R.S.2014, seeking to permit him to introduce evidence that the victim had a history of making false allegations of sexual assault. Specifically, in an affidavit attached to the motion, defense counsel attested that years prior to the sexual assault at issue, the victim made two separate reports of sexual assault, each one alleging a different perpetrator.

¶ 32 In the first report, the victim alleged that she had been sexually assaulted by G.P. That case was closed after the victim refused to cooperate in the investigation of her allegations.

¶ 33 In the second report, counsel asserted that the victim had made allegations of sexual assault against J.V.R. and that

> [d]uring the investigation of this case, police received information from an unnamed witness suggesting the allegations made by [the victim] against [J.V.R.] were false. The charges against [J.V.R.] were subsequently dismissed by the court.

¶ 34 The trial court denied Lancaster's motion, concluding that as a matter of law, the motion did not merit an evidentiary hearing.

### B. Sufficiency of the Offer of Proof

▮▮▮▮ ¶ 35 We review a trial court's evidentiary rulings, including its determination of evidence's admissibility under the rape shield statute, for an abuse of discretion. *People v. Cook*, 2014 COA 33, ¶ 34, 342 P.3d 539, 547.

▮▮▮▮ ¶ 36 Colorado's rape shield statute "deems the prior or subsequent sexual conduct of any alleged victim to be presumptively irrelevant to the criminal trial." *People v. Weiss*, 133 P.3d 1180, 1185 (Colo. 2006). The statute, however, contains several exceptions to this rule. *See id.* at 1185–86. One of these exceptions allows for the admission of "evidence that the victim or a witness has a history of false reporting of sexual assaults," if the procedure specified in the statute is followed. § 18–3–407(2).

¶ 37 The specified procedure requires the moving party to file a written motion stating that he or she has "an offer of proof of the relevancy and materiality" of that evidence. § 18–3–407(2)(a). This motion must be accompanied by an affidavit setting forth the offer of proof. § 18–3–407(2)(b).

¶ 38 If the court finds that the offer of proof is sufficient, the court must notify the other parties of this finding. § 18–3–407(2)(c). If the prosecution stipulates to the facts in the offer of proof, then the court must rule on the motion without a hearing. *Id.* Otherwise, the court must set an in camera hearing prior to trial. *Id.*

¶ 39 Accordingly,

[t]o invoke a rape shield hearing to pierce the statute, defendant's motion must be accompanied by an offer of proof under section 18–3–407(2)(b) *sufficient to demonstrate, by a preponderance of the evidence, at the in camera evidentiary hearing that the alleged victim made multiple reports of prior or subsequent sexual assault that were in fact false.* Because a prosecutor may decline to bring charges for any number of reasons, the fact that sexual assault reports by the victim did not result in charges being brought is not a sufficient offer of proof upon which a trial court may order an evidentiary hearing pursuant to section 18–3–407(2).

Prosecutorial discretion to bring or not bring charges is extraordinarily wide. Many considerations go into deciding whether to file a case and, if filed, whether to continue pursuing it. In sexual assault cases, victims must consider the emotional price they will have to pay in placing their most intimate personal experiences before the public, and prosecutors may be called upon to abandon the case at the victim's insistence or for other strategic reasons.

*Weiss,* 133 P.3d at 1188–89 (emphasis added).

¶ 40 Here, Lancaster's offer of proof was insufficient to demonstrate, by a preponderance of the evidence, the falsity of the victim's second report. Specifically, although counsel alleged that the second report resulted in charges that were dismissed, as noted above, such an allegation is insufficient, in and of itself, to establish the falsity of the report. *See id.* Moreover, although Lancas-

ter alleged that the police received information from an unnamed witness suggesting that the victim's report was false, this information would have been inadmissible hearsay. *See id.* at 1186–87 ("An 'offer of proof' typically states ... all the facts necessary to establish the testimony's admissibility.").

¶ 41 Accordingly, Lancaster's offer of proof demonstrated, at most, only one prior false report of sexual assault. The offer was thus insufficient to warrant a hearing under the rape shield statute. *See id.* at 1188.

## C. Right to Present a Complete Defense

¶ 42 Because Lancaster did not argue to the trial court that its ruling regarding the rape shield evidence violated his right to present a complete defense, we review that contention for plain error. *See People v. Clark,* 2015 COA 44, ¶ 123, 370 P.3d 197 (reviewing for plain error the defendant's assertion, made for the first time on appeal, that the admission of evidence without a limiting instruction violated his constitutional rights). Plain error review addresses error that is obvious and substantial and that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *People v. McMinn,* 2013 COA 94, ¶ 42, ––– P.3d –––.

An erroneous evidentiary ruling may rise to the level of constitutional error if it deprived the defendant of any meaningful opportunity to present a complete defense. A defendant's right to present a defense is violated only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence.

*People v. Conyac,* 2014 COA 8M, ¶ 93, 361 P.3d 1005 (citation omitted).

¶ 43 Although Lancaster argues that the rape shield evidence would have been material to a consent defense, he never advanced such a defense at trial. In fact, Lancaster consistently maintained, from his first statements to the police through trial, that he did not even know the victim.

¶ 44 In addition, Lancaster does not explain, nor do we perceive, how the court's ruling on the rape shield evidence denied him

the ability to present a consent defense or of his only means of effectively testing significant prosecution evidence. *See id.*

¶ 45 Accordingly, we perceive no error, much less plain error, regarding Lancaster's right to present a complete defense.

## IV. Sentencing

██ ¶ 46 Finally, Lancaster contends that the trial court misapprehended the sentencing range for sexual assault and erroneously sentenced him outside the presumptive range. Because the record is not sufficiently developed for us to determine this issue, we vacate the sentences on the sexual assault counts and remand for resentencing on those counts.

### A. Pertinent Facts

¶ 47 Lancaster was convicted of sexual assaults as class two felonies. In connection with its verdicts on those counts, the jury expressly found that Lancaster

was armed with a deadly weapon or any article used or fashioned in a manner to cause a person to reasonably believe that the article was a deadly weapon or represented verbally or otherwise that the defendant was armed with a deadly weapon, and used the deadly weapon, article or representation to cause submission of the victim.

¶ 48 Moreover, at the sentencing hearing, the prosecutor conceded that Lancaster "did not actually have a weapon or produce a weapon, he just threatened the use of it. . . ." Similarly, the prosecutor said that Lancaster "was armed *or verbally represented* that he was armed with a deadly weapon" (emphasis added).

¶ 49 The prosecutor then represented that the sentencing range for the sexual assault counts at issue here was an indeterminate sentence, with the lower end of the range being sixteen to forty-eight years.

¶ 50 When sentencing Lancaster, the court did not offer its view of the proper sentencing range on the sexual assault counts. Nor did it expressly reference "extraordinary aggravating circumstances." The court observed, however, that the victim was raped "in a horrible way," that the crime had an impact "on the entire community," and that

the victim was "psychologically damaged for who knows how long."

### B. Discussion

¶ 51 Sexual assault is a class two felony when, as pertinent here, an actor

is armed with a deadly weapon or an article used or fashioned in a manner to cause a person to reasonably believe that the article is a deadly weapon or represents verbally or otherwise that the actor is armed with a deadly weapon and uses the deadly weapon, article, or representation to cause submission of the victim.

§ 18–3–402(5)(a)(III), C.R.S.2014. Any person convicted of felony sexual assault on or after November 11, 1998, under the circumstances described in section 18–3–402, "shall be sentenced in accordance with the provisions of part 10 of article 1.3 of this title." § 18–3–402(6). (Section 18–3–402(6), not section 18–3–402(5)(b) on which the People rely, applies here, because Lancaster's offense was committed on or after November 1, 1998.)

¶ 52 Part 10 of article 1.3 is part of the Colorado Sex Offender Lifetime Supervision Act of 1998 (the Act). As pertinent here, section 18–1.3–1004(1)(a), C.R.S.2014, provides that the defendant shall be sentenced to "an indeterminate term of at least the minimum of the presumptive range specified in section 18–1.3–401 for the level of offense committed and a maximum of the sex offender's natural life."

¶ 53 The Act requires that only the upper end of a sentence be indeterminate. *See People v. Villa,* 240 P.3d 343, 359 (Colo.App. 2009). With respect to the lower term, the presumptive range for sexual assault as a class two felony is sixteen years to twenty-four years. *See* §§ 18–1.3–401(1)(a)(V)(A), C.R.S.2014 (providing that the presumptive range for a class two felony is eight to twenty-four years), 18–1.3–401(8)(e.5) (providing that if a defendant is convicted of a class two felony sex assault under section 18–3–402(5), the court shall be required to sentence the defendant to an indeterminate sentence of at least the midpoint in the presumptive range for the punishment of that class of felony up to the defendant's natural life). A court may,

however, impose a sentence of up to twice the maximum of that presumptive range if aggravating factors are present. § 18–1.3–401(6). Thus, the Act must be construed to require sentencing to an upper term of the sex offender's natural life and a lower term "of a definite number of years, not less than the minimum nor more than twice the maximum of the presumptive range authorized for the class of felony of which the defendant stands convicted." *Vensor v. People*, 151 P.3d 1274, 1279 (Colo.2007).

¶ 54 In addition, section 18–1.3–1004(1)(b) provides that when an offense subject to the Act is a crime of violence, the court shall sentence the defendant for an indeterminate term of at least the midpoint in the presumptive range for the level of offense committed and a maximum of the sex offender's natural life. As pertinent here, sexual assault is a crime of violence when the prosecution pleads and proves either that the defendant "[u]sed, or possessed and threatened the use of, a deadly weapon" or "[c]aused serious bodily injury or death...." § 18–1.3–406(2)(a)(I), (II)(E), C.R.S. 2014. (Although the People rely on section 18–1.3–406(2)(b)(I), that section applies only to certain sex offenses against children and is inapplicable here.) If the defendant is convicted of sexual assault as a crime of violence, then the lower term cannot exceed twice the maximum of the presumptive range authorized for the class of felony of which the defendant stands convicted. *See People v. Hunsaker*, 2015 CO 46, ¶¶ 16–27, 351 P.3d 388.

¶ 55 Here, as an initial matter, we reject the People's argument that the sexual assaults at issue constituted crimes of violence. The jury's verdict set forth a list of alternative findings, which included a finding that Lancaster had used or possessed and threatened the use of a deadly weapon. The verdict, however, did not clarify which of the listed alternatives the jury actually found. Thus, we cannot determine whether the jury found that Lancaster had used or possessed and threatened the use of a deadly weapon, which finding was necessary to support a crime of violence determination. Indeed, at sentencing, the prosecutor effectively conceded that the evidence did *not* support such a finding, noting that (1) Lancaster did not actually use or produce a weapon, he just threatened the use of it; and (2) Lancaster was either armed or verbally represented that he was.

¶ 56 The question thus becomes whether the court's sentence of twenty-five years to life on each sexual assault count was nonetheless proper.

¶ 57 Because the prosecutor incorrectly stated at the sentencing hearing that the lower term on the sexual assault counts was sixteen to forty-eight years, when in fact it was sixteen to twenty-four years, the court may have imposed a sentence of twenty-five years to life based on a misapprehension of the applicable sentencing range. Because the record is insufficient to allow us to determine the court's understanding, and because a misapprehension of the applicable sentencing range requires a remand, we conclude that a remand for resentencing is necessary here. *See People v. Linares-Guzman*, 195 P.3d 1130, 1137 (Colo.App.2008) ("Where a trial court misapprehends the scope of its discretion in imposing sentence, a remand is necessary for reconsideration of the sentence within the appropriate sentencing range.").

¶ 58 We are not persuaded otherwise by the People's argument that even if the presumptive sentencing range for the lower term of Lancaster's indeterminate sentence was no more than twenty-four years, we can still affirm the sentence because the trial court found extraordinary aggravating circumstances justifying an upward departure from the presumptive sentencing range. For the reasons set forth above, if the trial court misapprehended the presumptive sentencing range, then we cannot affirm on this ground because the court's misunderstanding alone requires a remand. *See id.* Moreover, although at the sentencing hearing, the court mentioned the crime's horrible nature and the harm to the victim, the record does not clearly indicate that the court, in fact, intended to find any extreme aggravating circumstances, let alone one that complied with or was exempt from the requirements of *Blakely v. Washington*, 542 U.S. 296, 301–05, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). *See Lopez v. People*, 113 P.3d 713, 731 (Colo.2005) (concluding that one *Blakely*-compliant or *Blakely*-exempt factor is sufficient to support

an aggravated sentence, even if the sentencing court also considered factors that were not *Blakely*-compliant or *Blakely*-exempt).

## V. Conclusion and Remand Order

¶ 59 For these reasons, the judgment is affirmed, the sentences on the sexual assault counts are vacated, and the case is remanded with directions that the court resentence Lancaster on the sexual assault counts in accordance with the sentencing range set forth above (i.e., indeterminate sentencing with the lower term being in the range of sixteen to twenty-four years). If the court decides to sentence Lancaster outside the presumptive range pursuant to section 18–1.3–401(6), then the court must make specific findings on the record, consistent with *Blakely,* detailing the specific extraordinary aggravating circumstances that constitute the reasons for varying from the presumptive range.

JUDGE RICHMAN and JUDGE NAVARRO concur.