COLORADO COURT OF APPEALS                                    **2017COA41**

---

Court of Appeals No. 14CA1030
Adams County District Court No. 13CR27
Honorable Thomas R. Ensor, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Anton Jose Valdez,

Defendant-Appellant.

---

JUDGMENT AND SENTENCE AFFIRMED

Division III
Opinion by JUDGE WEBB
Bernard and Dunn, JJ., concur

Announced April 6, 2017

---

Cynthia H. Coffman, Attorney General, Kevin E. McReynolds, Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Stephen Arvin, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    A jury convicted Anton Jose Valdez of first degree murder after deliberation and several other charges arising from the robbery of a jewelry store during which one of the two hooded robbers shot and killed the owner. Valdez did not testify but defended based on misidentification. On the first degree murder count, the trial court sentenced him to life imprisonment without the possibility of parole. On the aggravated robbery count, the court imposed a consecutive sentence of thirty-two years in the custody of the Department of Corrections. It imposed concurrent sentences on the other counts.

¶ 2    Valdez seeks a new trial based on rulings admitting DNA evidence from the crime scene and surveillance camera videos of the robbery in progress.

- As to the DNA evidence, he asserts that the match was derived from a sample unconstitutionally collected when he was arrested on an unrelated charge.

- As to one of the videos, he asserts that depiction of the owner's dying moments was unfairly prejudicial, and as to all of the videos that the court should have restricted the jury's replaying them during deliberations.

Alternatively, he challenges the trial court's conclusion that the crime of violence statute required consecutive sentencing on the aggravated robbery count. The Attorney General concedes preservation of all issues.

¶ 3     Discerning no evidentiary errors, we affirm the judgment of conviction. Then addressing a novel question in Colorado, we further conclude that because affirmance means Valdez was lawfully sentenced to a life term without parole, his challenge to the consecutive sentence is moot.

### I. The Trial Court Did Not Err in Allowing the Prosecution to Present Evidence Linking DNA From the Crime Scene to a DNA Sample Previously Taken from Valdez in Connection with His Arrest on a Felony Traffic Offense

¶ 4     In his suppression motion, Valdez argued that taking the DNA sample during his arrest for aggravated driving under restraint – habitual offender, § 42-2-206(1)(b)(II), C.R.S. 2016, constituted an unreasonable search and seizure under both the United States and Colorado Constitutions. According to Valdez, a constitutional violation occurred because aggravated driving under restraint "is not a serious offense" under *Maryland v. King*, 569 U.S. ___, ___, 133 S. Ct. 1958, 1980 (2013). However, the motion conceded that

2

because Valdez had entered into a plea agreement and pleaded guilty to only misdemeanors, he was eligible for — but had failed to pursue — the DNA expungement procedures under section 16-23-105, C.R.S. 2016. This section is part of Katie's Law, §§ 16-23-101 to -105, C.R.S. 2016. In response, the prosecutor primarily asserted that the DNA collection was constitutional because Valdez had been arrested for a felony, as provided in Katie's Law.

¶ 5    After hearing argument from counsel, the trial court denied the motion from the bench. The court found that Valdez's motion was an improper "collateral attack on evidence obtained in another case . . . where that evidence was never sought to be suppressed" and "where [Valdez] had the opportunity to remove that DNA from the database, since he was not convicted of a felony." Alternatively, it concluded that collection of Valdez's DNA was constitutional because he "was, in fact, arrested for a serious matter . . . and it would, in fact, pass muster pursuant to [the] . . . *King* decision."

## A. Collateral Estoppel

¶ 6    Although Valdez's opening brief argues that the trial court erred in denying his motion as an improper "collateral attack," the Attorney General does not defend the court's ruling on this basis. Still, under the doctrine of constitutional avoidance, we address constitutional issues only if necessary. *See Developmental Pathways v. Ritter*, 178 P.3d 524, 535 (Colo. 2008) (stating that judicial restraint requires courts to avoid reaching constitutional questions in advance of the necessity of deciding them); *People v. Lybarger*, 700 P.2d 910, 915 (Colo. 1985) ("Axiomatic to the exercise of judicial authority is the principle that a court should not decide a constitutional issue unless and until such issue is actually raised by a party to the controversy and the necessity for such decision is clear and inescapable."). And were we to agree with the trial court that Valdez was estopped from challenging collection of his DNA, we would never reach the constitutional question. So, we start with that aspect of the court's ruling, but reject it as a misapplication of the law.

¶ 7    To begin, one may wonder if the doctrine of collateral estoppel (also called issue preclusion) applies in criminal cases.  It does.  *See generally People v. Smith*, 938 P.2d 111, 113 (Colo. 1997).

¶ 8    Even so, the scope of this doctrine may be narrower in criminal cases.  Deciding that a defendant is estopped from relitigating an issue in a second criminal proceeding depends on whether "the question was 'distinctly put in issue and directly determined' in the [prior] criminal prosecution."  *Metros v. U.S. Dist. Court*, 441 F.2d 313, 316 (10th Cir. 1970) (quoting *Kauffman v. Moss*, 420 F.2d 1270, 1274 (3d Cir. 1970)).  Because in the traffic case Valdez failed to either move to suppress the DNA sample before pleading guilty or seek expungement based on his misdemeanor plea, the constitutional issue raised in this appeal was not determined.  *Compare Commonwealth v. Lunden*, 35 N.E.3d 412, 416 (Mass. App. Ct. 2015) ("In the [prior] case, the defendant did not move to suppress the blood evidence match, and therefore despite the defendant's conviction the [prior] proceeding did not result in a final judgment on the merits . . . ."), *with Sharp v. State*, 835 N.E.2d 1079, 1085 (Ind. Ct. App. 2005) ("[The defendant]

5

litigated the constitutionality of the taking of his DNA that was placed in the database in the prior case, and he presented that issue in the prior appeal. Hence, we can only conclude that [he] had the full and fair opportunity to litigate the issue he raises here, and the doctrine of collateral estoppel precludes him from relitigating the issue now.").

¶ 9 Thus, because Valdez's constitutional challenge cannot be avoided, we turn to it.

### B. Constitutionality of the DNA Collection in the Traffic Case

#### 1. Standard of Review and Law

¶ 10 Suppression rulings normally present a mixed question of fact and law. *See People v. Cisneros*, 2014 COA 49, ¶ 56. But Valdez's contention only raises an issue of law — he challenges the constitutionality of section 16-23-103, C.R.S. 2016, as applied to him. And "[w]e review the constitutionality of a statute, both facially and as applied, de novo." *People v. Lovato*, 2014 COA 113, ¶ 12.

¶ 11 When reviewing a statute, we presume that it satisfies constitutional standards. *People v. Baer*, 973 P.2d 1225, 1230

(Colo. 1999). The party challenging a statute on constitutional grounds — whether as applied or facial — bears the burden of establishing the statute's unconstitutionality beyond a reasonable doubt. *Id.*[1]

¶ 12    In *King*, 569 U.S. at ___, 133 S. Ct. at 1970, 1980, the Supreme Court upheld a Maryland DNA collection statute that required "all arrestees charged with serious crimes" to submit a buccal swab for DNA testing solely as a police booking procedure. The Court concluded:

> DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. When officers make an arrest supported by probable cause to hold for *a serious offense* and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.

*Id.* at ___, 133 S. Ct. at 1980 (emphasis added).

---

[1] In *Tabor Foundation v. Regional Trans. Dist.*, 2016 COA 102, our supreme court has granted certiorari to consider this standard. 16SC639, 2017 WL 280826 (Colo. Jan. 23, 2017).

¶ 13    Like the Maryland statute, section 16-23-103(1)(a) requires that for "[e]very adult arrested on or after September 30, 2010, *for a felony offense* or for the investigation of a felony offense . . . [t]he arresting law enforcement agency shall collect the biological substance sample from the arrested person as part of the booking process." (Emphasis added.)  These samples are tested by the Colorado Bureau of Investigation (the CBI) and are filed in the state index system.  § 16-23-104(2), C.R.S. 2016.

¶ 14    But unlike the Maryland statute, Katie's Law does not impose an express seriousness requirement.  The Attorney General seeks to fill this gap by arguing that every felony is serious.

¶ 15    The Colorado Supreme Court has not spoken to the constitutionality of Katie's Law.  In *People v. Lancaster*, 2015 COA 93, ¶ 23, however, the division concluded that a DNA sample taken in violation of section 16-23-103(1)(a) — because the defendant had been arrested for only misdemeanor traffic offenses — did not violate the defendant's constitutional privacy interests.

¶ 16    Of course, the division acknowledged that "[a] cheek swab to obtain a DNA sample is a search, and a search without a warrant

supported by probable cause is presumptively unreasonable unless it falls within one of the established exceptions to the warrant requirement." *Id.* at ¶ 14. Then the division turned to one such exception — that for "special needs" — which "balance[s] the government's special need against the individual's asserted privacy interests." *Id.* at ¶ 15 (quoting *People v. Rossman,* 140 P.3d 172, 174 (Colo. App. 2006)).

¶ 17     In applying this exception, the division held that "the government's interest in the DNA sample was not outweighed by [the defendant's] privacy interests." *Id.* at ¶ 23. It explained that after an arrest, "the intrusion into [the arrestee's] privacy resulting from the buccal swabs was minimal and akin to booking procedures like the fingerprinting and photographing of a suspect." *Id.* On this basis, the division concluded that "the trial court did not err in denying [the defendant's] motion to suppress the DNA profile that was allegedly developed as a result of the prior warrantless collections of DNA evidence from him." *Id.* at ¶ 25.

¶ 18    Valdez cites no contrary Colorado authority, nor are we aware of any.  We consider *Lancaster* well reasoned and apply it as follows.

## 2.  Application

¶ 19    Valdez raises three constitutional arguments.  We consider and reject each in turn.

¶ 20    First, Valdez argues that although he was arrested for aggravated driving, his DNA was "not taken pursuant to a serious offense as contemplated in [*King*]."

¶ 21    *Lancaster*, where the defendant was "only in custody for misdemeanor offenses," *id.* at ¶ 26, rejected a similar argument.  As the division explained, "[a]lthough in *King*, 133 S. Ct. at 1980, the Supreme Court concluded that it was constitutional to collect DNA from a suspect detained in custody for a 'serious offense,' the Court did not hold that it is unconstitutional to take DNA from arrestees under all other circumstances."  *Id.*  Instead, "the magnitude of the state's interest does not necessarily depend on the seriousness of the crime of arrest.  As [*King*] observed, 'people detained for minor offenses can turn out to be the most devious and dangerous

10

criminals.'" *Id.* (quoting *Haskell v. Harris*, 745 F.3d 1269, 1273 (9th Cir. 2014) (Smith, J., concurring in the judgment), in turn quoting *King*, 569 U.S. at ___, 133 S. Ct. at 1971).

¶ 22     Because, under *Lancaster*, Valdez's proposed "serious felony" litmus test for constitutionality falls short, we decline to decide whether aggravated driving is such an offense or whether all felonies are serious.

¶ 23     *Lancaster* also rejected Valdez's second argument — that unlike the Maryland statute in *King*, Katie's Law "is clearly not designed to identify defendants in the manner of a booking procedure."  True enough, the legislative declaration in section 16-23-102(1), C.R.S. 2016, refers to "preventing" and "solving" crimes.  And these purposes are beyond the ambit of merely establishing an arrestee's identity.

¶ 24     Even so, the division held that "[t]he statute at issue in *King* did not expressly say that identification was its sole governmental interest." *Lancaster*, ¶ 27.  It added, "[n]or did the Supreme Court say that identification is the *only* legitimate governmental interest served by collecting DNA samples." *Id.*  And section 16-23-102(1)(b)

11

recognizes that "[t]he analysis of DNA has been used numerous times in the exoneration of innocent individuals charged with or convicted of crimes."

¶ 25    Valdez's third argument — that collection of his DNA was unconstitutional because Katie's Law "lacks adequate privacy provisions" — fares no better.  Specifically, he asserts that under Katie's Law, a person charged with a felony has the burden of requesting expungement of the DNA sample.  In contrast, under the Maryland statute, DNA samples are destroyed if "criminal action begun against the individual . . . does not result in a conviction." *King*, 569 U.S. at ___, 133 S. Ct. at 1967.

¶ 26    Valdez relies solely on *People v. Buza*, 180 Cal. Rptr. 3d 753, 789 (Cal. Ct. App. 2014).  There, the court held "[t]he fact that the [California] DNA Act does not provide for automatic expungement increases the weight of the arrestee's privacy interest."  But this decision has been depublished because review has been granted by the California Supreme Court. *People v. Buza*, 342 P.3d 415 (Cal. 2015).

¶ 27 Further, in *Haskell v. Harris*, 745 F.3d at 1274, the concurrence in the judgment rejected the assertion "that California's law is distinguishable from Maryland's because California retains and uses DNA samples indefinitely even if a suspect is never charged or convicted." Judge Smith explained that "the *King* Court did not view Maryland's expungement procedures as important to the constitutionality of Maryland's law." *Id.* Nor did the *King* Court "suggest that post-collection expungement procedures would affect the constitutional inquiry." *Id.* Instead, the Court framed the "Fourth Amendment search at issue" as "a buccal swab," and explained "the 'minor intrusion' that this 'brief' procedure represents is not affected at all by the availability of expungement procedures." *Id.* (quoting *King*, 569 U.S. at ___, 133 S. Ct. at 1980).

¶ 28 But even if expungement procedures are relevant to the constitutional inquiry, Katie's Law does not place an onerous burden on an arrestee. *See United States v. Mitchell*, 652 F.3d 387, 404 (3d Cir. 2011) (An "additional factor[] that contributed to the

13

reasonableness of the search" was that the DNA collection statute provided for expungement.).

¶ 29      For example, under section 16-23-104(2), "[i]f [the CBI] does not receive confirmation of a felony charge within a year after receiving the sample for testing, [it] *shall destroy the biological sample* and any results from the testing of the sample." (Emphasis added.)  Thus, the burden of ensuring that a DNA sample remains in the system after an arrest has been made falls on the district attorney.

¶ 30      Another example is that if charges are filed — but the arrestee is not convicted of a felony — the expungement process requires only minimal information from the arrestee along with a "declaration that, to the best of the person's knowledge, he or she qualifies for expungement." § 16-23-105(2)(e).  The burden then shifts back to the district attorney to notify the CBI "that the person does not qualify for expungement and [give] the reasons that the person does not qualify." § 16-23-105(4).  If such notification is not received within ninety days, the CBI "shall destroy the biological substance." *Id.*

¶ 31     And once a request for expungement has been made, Katie's

Law requires that the CBI "send notification . . . to the person

arrested or charged, either stating that [the CBI] has destroyed the

biological substance sample and expunged the results of the testing

of the sample or stating why [the CBI] has not destroyed the sample

and expunged the test results." § 16-23-105(5).  Thus, the burden

to follow up is not placed on the arrestee.

¶ 32     Finally, even if collection of Valdez's DNA did not violate the

United States Constitution, did the collection violate the Colorado

constitution?  Valdez says that it did.  But we agree with *Lancaster*,

¶ 24, that the "state constitution provides the same, not greater,

protection in this area than the Fourth Amendment."

¶ 33     In the end, because Katie's Law, as applied to Valdez, is

constitutional, we conclude that the trial court did not err in

denying his motion to suppress.

### II.  The Trial Court Did Not Abuse Its Discretion in Admitting a Surveillance Video that Depicted the Shooting

¶ 34     Video from multiple cameras inside the store captured the

robbery.  Defense counsel moved in limine for "an order that the

prosecution not be permitted to play for the jury the overhead

15

camera recording of the offense." This recording depicted the victim lying on the floor bleeding from several bullet wounds, being shot the final time, and giving up his last breath, over a period of less than one minute. Citing CRE 403, counsel argued that the prejudicial effect of this recording exceeded any probative value because it "is extremely graphic and alarming, and will unnecessarily enflame the passions of the jury"; the victim's death from gunshot wounds was undisputed; this video did not identify which of the robbers had been the shooter; and "[o]ther angles of video depict the entire event."

¶ 35 In denying the motion, the trial court explained:

> It shows the crime. This is a murder case. It is not pleasant. I understand that. There is no way I can sanitize it. So I will deny the request as it relates to the videotape of the crime itself. It can be played in its entirety to the jury.

All of the recordings were played for the jury during trial and, as discussed in the following section, replayed during deliberations.

### A. Standard of Review and Law

¶ 36 As with any evidence, whether to admit a video recording lies within the sound discretion of the trial court; absent an abuse of

16

discretion, its ruling on whether relevant video recordings were not unnecessarily gruesome must stand. CRE 403; *People v. Villalobos*, 159 P.3d 624, 630 (Colo. App. 2006). "[A]n abuse of that discretion will be found only upon a showing that the ruling was manifestly arbitrary, unreasonable, or unfair." *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002).

¶ 37    "Because the balance required by CRE 403 favors admission, a reviewing court must afford the evidence the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected." *Id.* Consistent with this preference for admission, evidence is not unfairly prejudicial merely because it damages the defendant's case. *People v. Dist. Court*, 785 P.2d 141, 147 (Colo. 1990). And evidence is unfairly prejudicial only if it has an "undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror." *Id.*

## B. Analysis

¶ 38    Valdez argues that the "challenged video added nothing meaningful to . . . documentation of the event," but it "surely shocked [jurors], likely triggering an emotional response and thirst for retribution for such a grisly killing." He cites no authority, nor are we aware of any in Colorado, excluding as unfairly prejudicial a video recording of the charged crime in progress. Instead, he relies on cases such as *People v. Ellis*, 41 Colo. App. 271, 273, 589 P.2d 494, 495 (1978), where the division held that the trial court had improperly admitted graphic photographs of a victim's injuries, which did not "shed enough light on the question of accident to counteract the passion and prejudice which they must have generated." His reliance is misplaced.

¶ 39    The recording from the overhead camera was not an ad hoc depiction of the consequences of a crime, such as autopsy photographs of a deceased victim or pictures of injuries to a victim who survived. Nor was it some sort of recreation. Rather, this recording showed the crime — as it was happening.

¶ 40    So, how could this recording be *unfairly* prejudicial?  We agree with those courts that have held similar recordings are not.  *See, e.g., Ivery v. State*, 686 So. 2d 495, 519 (Ala. Crim. App. 1996) ("The videotape here is without question prejudicial; however, 'while such direct evidence of a crime is certainly prejudicial to a defendant's case, without more, it is not unfairly so.'") (citation omitted); *Johnson v. State*, No. AP-77,030, 2015 WL 7354609, at *30 (Tex. Crim. App. Nov. 18, 2015) (unpublished opinion) ("Although the events captured by the surveillance videotape are disturbing, the videotape shows no more than how the offense transpired."); *cf. Bradley v. State*, 533 S.E.2d 727, 731 (Ga. 2000) ("The trial court did not err in admitting a state trooper's videotape of the victim in life on the side of the road shortly after she had been shot.  The court properly determined that the videotape . . . accurately depicted the ongoing crime shortly after the shooting occurred.").

¶ 41    In sum, we conclude that the trial court did not abuse its discretion by admitting the surveillance video from the overhead camera.

### III. The Trial Court Did Not Abuse Its Discretion in Declining to Limit the Number of Times the Jurors Could Watch the Surveillance Videos or Imposing Other Restrictions on the Jury's Consideration of the Videos

¶ 42    During deliberations, the jurors indicated that they wanted to view the surveillance videos. Defense counsel requested that the jury "not be granted unfettered access" to the videos and should only be "allow[ed] to view each video once." Counsel failed to ask that the jury be admonished not to favor one type of evidence over another. The court responded:

> I will not limit them to one time. I agree they are not to have unfettered access to them. We will have my clerk play them for them. The only people in the room will be the jurors and my clerk.

The record does not indicate how much time the clerk spent with the jurors or how often they replayed the videos. Nor did Valdez ask the trial court to make such a record after the jury returned the verdict but before it was discharged.

### A. Standard of Review and Law

¶ 43    Trial courts have broad discretion to control the use of exhibits during jury deliberations. *DeBella v. People*, 233 P.3d 664, 666 (Colo. 2010). When exercising this discretion, "the trial court's

20

ultimate objective must be to assess whether the exhibit will aid the jury in its proper consideration of the case, and even if so, whether a party will nevertheless be unfairly prejudiced by the jury's use of it." *Frasco v. People*, 165 P.3d 701, 704-05 (Colo. 2007).  But the court must also ensure that "evidence is not so selected, nor used in such a manner, that there is a likelihood of it being given undue weight or emphasis by the jury."  *Id.* at 703 (quoting *Settle v. People*, 180 Colo. 262, 264, 504 P.2d 680, 680-81 (1972)).

## B.  Analysis

¶ 44     Relying on *DeBella*, Valdez contends the court improperly gave the jurors unfettered access to the videos by not imposing any restrictions.  In *DeBella*, the supreme court held that the trial court had abused its discretion by leaving with the jury a TV monitor and the victim's videotaped interview, then failing to supervise or restrict playback.  233 P.3d at 667.

¶ 45     To begin, unlike in *DeBella*, here the videos were played for the jurors only after their request.  *See People v. Smalley*, 2015 COA 140, ¶ 65 ("The court did not automatically provide the jury with access to the recordings, but waited until the jury requested

21

them.").  And the videos were played for the jury by a court employee.  *See DeBella*, 233 P.3d at 669 (A court can "require that the video be viewed in open court or under the supervision of a bailiff.").  Thus, Valdez inaccurately describes the jury's access as "unfettered."

¶ 46    Still, and also unlike in *DeBella*, the court did not put any additional restrictions on viewing the videos — such as limiting the number of times the jury could watch them.  Nor did the court "admonish the jury not to give the exhibit undue weight or emphasis."  *Id.*

¶ 47    But are such restrictions even necessary when video evidence is nontestimonial?  *See People v. Jefferson*, 2014 COA 77M, ¶ 11, ("[A] trial court must 'oversee with caution' the jury's use of exhibits of a testimonial character, including video recorded interviews of witnesses.") (*cert. granted* Dec. 22, 2014).  The Attorney General says "no," arguing that *DeBella* involved only testimonial evidence and the surveillance videos were nontestimonial.  *See People v. Russom*, 107 P.3d 986, 989 (Colo. App. 2004) (a recording is

22

nontestimonial if it depicts "the event itself rather than a narration thereof").

¶ 48    The Attorney General is correct that several divisions of this court — all pre-*DeBella* — have distinguished between testimonial and nontestimonial evidence when upholding trial court decisions that allowed juries unlimited access to nontestimonial evidence. *See Russom,* 107 P.3d at 989 ("Jurors may have access during deliberations to nontestimonial recordings that depict the event itself rather than a narration thereof."); *People v. Aponte,* 867 P.2d 183, 188-89 (Colo. App. 1993) ("The videotape and its transcription do not constitute statements of witnesses testimonial in character as a narrative of events.  Rather, they are tangible exhibits with verbal content which are non-testimonial in character because they depict the actual commission of the crime itself."); *see also People v. Blecha,* 940 P.2d 1070, 1078 (Colo. App. 1996) (finding no grounds for a mistrial where jury had unsupervised access to a videotape that was nontestimonial, and was not shocking or inflammatory; "the videotape was similar in character to still photographs which jurors are normally permitted to review during deliberation"), *aff'd,*

23

962 P.2d 931 (Colo. 1998); *cf. People v. Gingles*, 2014 COA 163,

¶ 18 (allowing "unrestricted jury access during deliberations to a

defendant's voluntary and otherwise admissible confession").[2]

¶ 49    Since *DeBella*, the supreme court has not addressed whether

the same reasoning applies to nontestimonial evidence.[3]  But the

significance of this distinction need not be resolved here.  Even if

the trial court should have imposed greater restrictions on the

jury's consideration of this nontestimonial evidence, for two

reasons, the risk of undue emphasis was not so great as to show an

abuse of discretion.

- First, Valdez never disputed the accuracy of what the videos

  portrayed.  *See DeBella*, 233 P.3d at 668-69 ("[T]he

---

[2] These cases are consistent with the weight of authority in other jurisdictions.  *See Burkhart v. Commonwealth*, 125 S.W.3d 848, 850 (Ky. 2003) ("[N]umerous courts have allowed deliberating jurors to review audio and visual recordings of a non-testimonial character, often within the confines of the jury room.") (collecting cases).

[3] In *Rael v. People*, No. 13SC903, 2014 WL 7330995, at *1 (Colo. Dec. 22, 2014) (unpublished order), the supreme court granted certiorari on "[w]hether the court of appeals erred in affirming the trial court's decision to allow the jury unfettered and unsupervised access to . . . non-testimonial crime scene videos during deliberation."

24

inconsistencies of the tape's content with [the victim's] trial

testimony were central to the resolution of the case . . . .").

- Second, the prosecution presented corroborating evidence

  identifying the shooter through still photographs developed

  from the videos, to which the jury had unrestricted access

  without objection from Valdez.  *See Jefferson,* ¶ 18 ("The

  heightened danger that undue emphasis will be placed on

  detailed videotaped statements of victim-witnesses is

  exacerbated in cases like the present one, where minimal

  evidence corroborates the victim's statements and

  testimony.").

¶ 50     For these reasons, we conclude that the trial court did not

abuse its discretion in declining to limit the number of times the

jury could view the videos or in refusing to impose other restrictions

on the jury's consideration of them.

IV.  Because No Error Occurred, Valdez Is Not Entitled to Relief for
Cumulative Error

¶ 51     "To warrant reversal of a conviction based on cumulative error,

'numerous errors [must] be committed, not merely alleged.'"  *People*

*v. Thomas,* 2014 COA 64, ¶ 61 (alteration in original) (quoting

*People v. Whitman*, 205 P.3d 371, 387 (Colo. App. 2007)). Because we have not discerned any errors, this contention does not warrant relief.

## V. Valdez's Challenge to His Consecutive Sentence for Aggravated Robbery Is Moot

¶ 52    The Attorney General contends that error, if any, in running the aggravated robbery sentence consecutively to Valdez's life without the possibility of parole sentence is moot because a ruling could not have any practical effect on the length of his incarceration. Having affirmed Valdez's convictions on all charges, including first degree murder, we conclude that the consecutive sentence issue is moot.

### A. Standard of Review and Law

¶ 53    "We review de novo the legal question of whether a case is moot." *People in Interest of C.G.*, 2015 COA 106, ¶ 11 (*cert. granted* May 23, 2016).

¶ 54    As a "threshold jurisdictional matter," we must determine whether the current appeal is moot "before proceeding to the merits of the case." *USAA v. Parker*, 200 P.3d 350, 356 (Colo. 2009). "Mootness instructs courts not to grant relief that would have no

practical effect upon an actual and existing controversy." *Bd. of Dirs., Metro Wastewater Reclamation Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 105 P.3d 653, 656 (Colo. 2005).[4]

### B. Application

¶ 55 Whether a life without the possibility of parole sentence moots an error in imposing a lesser sentence consecutively rather than concurrently has not been addressed in any Colorado appellate opinion.

¶ 56 Other jurisdictions support the Attorney General's position on mootness. *See, e.g., Minshew v. State,* 975 So. 2d 395, 398 (Ala. Crim. App. 2007) ("To remand this case now to determine whether Minshew's probationary term for his theft conviction in case no. CC-86-727 was illegally run consecutively to his other probationary terms would not change the fact that Minshew is serving a sentence of life imprisonment without the possibility of parole."); *State v.*

---

[4] Limited exceptions to mootness exist, such as a factual situation capable of repetition yet avoiding review or where recurring constitutional violation has been alleged. *See, e.g., Comcast of Cal./Colo., L.L.C. v. Express Concrete, Inc.,* 196 P.3d 269, 275 (Colo. App. 2007). Because Valdez fails to raise any exceptions, we decline to address them.

*Macy*, 886 P.2d 1010, 1012 (Or. 1994) ("Currently, defendant is serving a term of imprisonment based on the matrix for concurrent life sentences. Therefore, as things now stand, defendant will serve a term of imprisonment under the same matrix that he would if this court were to hold that the trial court erred in imposing consecutive sentences."); *State v. Mathis*, No. M2011-01096-CCA-R3CD, 2013 WL 4774130, at *14 (Tenn. Crim. App. Sept. 5, 2013) (unpublished opinion) ("Having upheld Defendant Evans's convictions for especially aggravated kidnapping, any issues regarding the length of his sentences for the aggravated burglary and aggravated robbery convictions are essentially moot as they are to be served concurrently with two sentences of life without the possibility of parole."); *cf. Berger v. Norris*, No. 5:07CV00298JTR, 2009 WL 4067260, at *3 (E.D. Ark. Nov. 19, 2009) (unpublished opinion) ("While Petitioner's reduction in classification does affect his future accrual of good time credit, his consecutive life sentences make that entirely 'theoretical injury' a moot point.").

¶ 57    Valdez cites no directly contrary authority. Instead, he points out that two divisions of this court have addressed consecutive

28

sentencing errors in cases where a controlling sentence of life without the possibility of parole has been imposed. But these cases are distinguishable because here, rather than conceding error, the Attorney General raises mootness. *See People v. Phillips*, 2012 COA 176, ¶ 172 ("The People concede that when the evidence will support no reasonable inference other than that multiple convictions were based on identical evidence, the trial court is required to impose concurrent sentences for those convictions."); *People v. Holloway*, 973 P.2d 721, 726 (Colo. App. 1998) ("The People concede[d]" the error.). As well, neither division addressed mootness. And in any event, "we are not obligated to follow other divisions of this court." *Sandstrom v. Solen*, 2016 COA 29, ¶ 29.

¶ 58    Alternatively, Valdez argues that the issue is not moot because "circumstances might arise under which [his] life sentence is reduced." True enough, our supreme court did just this for certain juvenile offenders in *People v. Tate*, 2015 CO 42, ¶ 51. But *Tate* did not involve mootness. Valdez does not cite authority, nor have we found any in Colorado, holding that speculation about an as yet

29

unheralded change in the law — that would have retrospective application — should be considered as an exception to mootness.

¶ 59 At least one other state has rejected this argument. In *Quiroga v. Commissioner of Correction*, 87 A.3d 1171 (Conn. App. Ct. 2014), the defendant argued that his deportation did not moot his criminal appeal because Congress might change the criteria for readmission. Disagreeing, the court explained, "[w]e conclude that the possibility that Congress may, at some point in the future, amend federal immigration law so as to permit the petitioner's reentry into the country despite his narcotics convictions is pure conjecture." *Id.* at 1176; *see also Allende v. Shultz*, 845 F.2d 1111, 1121 (1st Cir. 1988) (then circuit judge Breyer, J., concurring) ("But, I do not see how this court can find (constitutionally speaking) a genuine 'controversy' premised on the fact that present law may change.").

¶ 60 In Colorado "[c]ourts should refuse to consider uncertain or contingent future matters that suppose speculative injury that may never occur." *Bd. of Dirs., Metro Wastewater Reclamation Dist.*, 105 P.3d at 656; *see also Air Pollution Control Comm'n of Colo. Dep't of*

*Health v. Colo.-Ute Elec. Ass'n*, 672 P.2d 993, 997 (Colo. 1983) ("We consider it unnecessary and inappropriate to address a question having only speculative future utility."). And recognizing such an exception to mootness would be problematic because, despite *stare decisis*, the law can always change. *See Creacy v. Indus. Comm'n*, 148 Colo. 429, 433, 366 P.2d 384, 386 (1961) ("The rule of stare decisis is not a doctrine of mortmain; it does not exclude room for growth in the law and the courts are not without power to depart from a prior ruling, or to overrule it, where sound reasons exist and where the general interests will suffer less by such departure than from a strict adherence."). Yet, "[e]xceptions should not swallow the rule." *A.S. v. People*, 2013 CO 63, ¶ 27.

¶ 61    Of course, Valdez could obtain certiorari review. But if our supreme court set aside his first degree murder conviction — and along with it the life without the possibility of parole sentence — yet affirmed the remaining convictions, the aggravated robbery sentence would control. In this event, Valdez would have to serve that sentence, irrespective of whether it had originally been imposed consecutively or concurrently. The same would be true if Valdez

succeeded in collaterally attacking his first degree murder conviction.

¶ 62     Given all this, we conclude that error, if any, in imposing the aggravated robbery sentence consecutively to the life without parole sentence is moot.

## VI.  Conclusion

¶ 63     The judgment and sentence are affirmed.

JUDGE BERNARD and JUDGE DUNN concur.