22CA1392 Peo v Larks 11-06-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1392
Weld County District Court No. 19CR2553
Honorable Allison J. Esser, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Dante Ramon Larks,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Meirink and Hawthorne*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 6, 2025

Philip J. Weiser, Attorney General, Trina K. Kissel, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Casey J. Mulligan, Alternate Defense Counsel, Boulder, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Defendant, Dante Ramon Larks, appeals his convictions for one count of sexual assault aided by a deadly weapon, two counts of sexual assault on a child by one in a position of trust as part of a pattern of abuse, one count of aggravated incest, and one count of child abuse.  We affirm.

## I.     Background

¶ 2     The charges in this case stem from the report of Larks' daughter, K.M.L., that Larks sexually assaulted her multiple times, from March 2018 until December 2018 when K.M.L. was removed from the family home.  K.M.L. was fourteen and fifteen years old at the time.

¶ 3     K.M.L. first disclosed the sexual assaults to her sister, K.A.L., in October 2019.  Shortly thereafter, forensic interviewer Chris Eisenhauer interviewed K.M.L., and K.M.L. detailed the verbal, physical, and sexual abuse she experienced from Larks.  The jury heard recordings of this interview at trial and testimony from K.M.L., K.A.L., Eisenhauer, and L.Z.L., Larks' wife and K.M.L.'s mother.

¶ 4     Following a fourteen-day trial, the jury convicted Larks of aggravated incest, sexual assault aided by a deadly weapon, sexual

assault on a child by one in a position of trust as part of a pattern of abuse, and child abuse. The jury hung on three other counts, which were dismissed. Larks was sentenced to 122 years to life in the Department of Corrections' custody.

¶ 5 Larks raises five issues on appeal. We address and reject each in turn.

## II. Statement Regarding the 2016 Report

¶ 6 Larks first contends that the trial court erred by precluding evidence that K.M.L., after reporting in 2016 that she was sexually assaulted by a peer, told K.A.L., "I have no idea what it's like to be sexually assaulted." The parties disagree over whether this issue is preserved. However, because we conclude that Larks waived this contention of error and thus decline to review the court's determination, we need not reach the preservation issue. *See People v. Rediger*, 2018 CO 32, ¶ 40 (waiver extinguishes error and therefore appellate review).

### A. Additional Background

¶ 7 In 2016, K.M.L. reported that a peer sexually assaulted her. K.M.L. was later diagnosed with post-traumatic stress disorder (PTSD) in 2018. Premised on this diagnosis, the prosecution

charged Larks with child abuse resulting in serious bodily injury (SBI) under section 18-6-401(1)(a), C.R.S. 2025. The trial court dismissed this count and the prosecution appealed. In an unpublished opinion, a division of this court concluded that K.M.L.'s PTSD diagnosis established probable cause that Larks committed the crime of child abuse resulting in SBI and reinstated the count. *People v. Larks*, (Colo. App. No. 20CA1060, Nov. 12, 2020) (not published pursuant to C.A.R. 35(e)).

¶ 8 Larks then filed a pretrial motion asking to introduce evidence — under the Colorado Rape Shield Statute, section 18-3-407(1)(b), C.R.S. 2022[1] — that "the victim was diagnosed with PTSD as a result of a [2016] sex assault [by a peer] that predates the date of offense in this case." The trial court granted this motion. The court cautioned, however, that Larks could not use evidence of the alleged 2016 assault to also show a history of false reporting as that would implicate section 18-3-407(2), which requires a separate motion

---

[1] The current version of the statute differs from the 2022 version in that only one instance of false reporting is required instead of a history of false reporting. § 18-3-407, C.R.S. 2025. We cite the 2022 version throughout this opinion because the court decided Larks' motion under that version.

and different proof.  Defense counsel conceded that he could not "make a good faith claim that there's a history of false reporting."

¶ 9     In his opening statement, defense counsel said that K.M.L. was treated for "PTSD that she had been diagnosed with . . . based upon a sexual assault that occurred in 2016."  The following day, defense counsel informed the court that he planned to elicit testimony from K.A.L. that K.M.L. told her, after making the 2016 report, "I don't know what it's like to be sexually assaulted."  This, defense counsel opined, amounted to K.M.L. "admitt[ing] that she was not, in fact, sexually assaulted by this young man," and it was therefore probative of K.M.L.'s character for untruthfulness.  The court ruled that the statement was inadmissible and reiterated that if defense counsel wanted to use the 2016 report to show a history of false reporting, defense counsel had to follow the procedure in section 18-3-407(2), which he had not done.

¶ 10     Three days later, during direct examination, the prosecution asked K.M.L. about the 2016 report.  Defense counsel objected on relevance grounds.  The court overruled the objection, concluding that the question was relevant to establishing a timeline after K.M.L. mentioned the peer in a forensic interview video viewed by

4

the jury. Larks argues, for the first time on appeal, that this "opened the door" to inquiry about K.M.L.'s statement to K.A.L. As discussed below, we do not assess this contention's merits because we conclude that Larks waived his right to introduce the statement.

### B. Applicable Law and Analysis

¶ 11  "[A]n appellate court has an independent, affirmative duty to determine whether a claim is preserved and what standard of review should apply, regardless of the positions taken by the parties." *Forgette v. People*, 2023 CO 4, ¶ 15 (quoting *People v. Tallent*, 2021 CO 68, ¶ 11). We review de novo whether a claim is waived. *Id.*

¶ 12  Waiver is the intentional relinquishment of a known right. *Id.* at ¶ 28. "A waiver may be explicit, as, for example, when a party expressly abandons an existing right or privilege, or it may be implied, as when a party engages in conduct that manifests an intent to relinquish a right or privilege or acts inconsistently with its assertion." *Id.* An appellate court "indulge[s] every reasonable presumption against waiver." *Rediger*, ¶ 39 (quoting *People v. Curtis*, 681 P.2d 504, 514 (Colo. 1984)). Forfeiture, on the other hand, is the failure to make the timely assertion of a right. *Id.* at

5

¶ 40.  This distinction is significant because waiver extinguishes appellate review, but forfeiture does not.  *Id.*

¶ 13    Larks' counsel mentioned the 2016 report during opening statements and moved to introduce it as an alternate cause of PTSD.  This was likely a strategic attempt to undermine the prosecution's theory that Larks caused K.M.L.'s PTSD.  *See People v. Daley*, 2021 COA 85, ¶ 117 (the defendant made a strategic choice by choosing to reference evidence in her opening statement that the prosecution later discussed during direct examination).  Larks cannot now argue on appeal that the court deprived him of the right to introduce K.M.L.'s statement to cast doubt on the report's truthfulness.  He moved to admit the report for its truth; he cannot simultaneously introduce evidence purporting to show that it was false.  *See People v. Babcock*, 2023 COA 49, ¶ 28 (concluding that the defendant waived an argument when he took contradictory stances on the same issue), *aff'd*, 2025 CO 26.  Larks' conflicting position amounts to waiver, precluding our review.  *See Forgette*, ¶ 28.

### III. Eisenhauer's Testimony

¶ 14    Larks next argues that the trial court erred by allowing Eisenhauer, a prosecution-endorsed expert in forensic interviewing, to imply that K.M.L. "was telling the truth." Larks points to two instances of purported improper bolstering: (1) when the prosecution asked, and Eisenhauer answered, if there is a difference between a child responding to the question, "Were you sexually assaulted?" and a child disclosing the assault through "free recall" (recall testimony); and (2) when the prosecution asked, and Eisenhauer answered, why she always elicits a promise from children "to tell the truth" during forensic interviews (rapport building testimony). We address these contentions separately because the two instances present distinct preservation issues, but we disagree with Larks on both accounts.

#### A. Recall Testimony

##### 1. Additional Background

¶ 15    On cross-examination, defense counsel asked Eisenhauer about a child's suggestibility. Specifically, counsel asked if there is a difference between a child saying, "in free recall, 'I was sexually assaulted,' versus . . . an adult or authority figure ask[ing] the

child, 'were you sexually assaulted,' and then the child answers in the affirmative?" Eisenhauer answered that there "certainly could be," depending on "the relationship they have with the person that's asking them and their tone of voice."

¶ 16    On redirect examination, the prosecution reminded Eisenhauer of defense counsel's question about the difference between free recall and someone asking the child a question. The prosecution then asked, "If you're asked a question of, 'were you sexually assaulted,' does that mean that the answer is less true than if you were saying, free recall, 'I was sexually assaulted?'" Defense counsel objected to the question's language, and the court overruled the objection. The prosecution proceeded to ask if both a free recall statement and an answer to a question could be equally true or equally false, to which Eisenhauer responded affirmatively.

¶ 17    Larks argues on appeal that this amounts to inadmissible bolstering because K.M.L.'s credibility was the "focal issue in the case." In answering the prosecution's question, Larks contends that Eisenhauer implied K.M.L. was being truthful. We do not address the merits of this contention because we determine that Larks invited the error.

## 2. Applicable Law and Analysis

¶ 18    "The doctrine of invited error prevents a party from complaining on appeal of an error that he or she has invited or injected into the case; the party must abide the consequences of his or her acts." *Rediger*, ¶ 34.  Because Larks invited this testimony by first raising the issue on cross-examination, we decline to address his argument that the trial court erred by allowing the prosecution to ask a follow-up question about that testimony.  *See People v. Munoz*, 240 P.3d 311, 320 (Colo. App. 2009) (concluding that the defendant invited follow-up testimony on redirect by asking questions about the same subject matter on cross-examination).  Larks "cannot complain of any error that resulted from testimony he himself elicited."  *Id.*

## B. Rapport Building Testimony

### 1. Additional Background

¶ 19    Eisenhauer was qualified as an expert in forensic interviewing and conducted three forensic interviews with K.M.L.  On direct examination, Eisenhauer described the process she follows in each interview, beginning with a "rapport building" phase in which she gets to know the child, helps her feel comfortable, and assesses her

developmental level. During this phase, Eisenhauer "elicit[s] a promise of the truth." The prosecution asked why she does that, and Eisenhauer responded, "I do that because research shows if they promise to tell the truth, that they're more likely than not to tell the truth."

¶ 20    On appeal, Larks argues this testimony implied that K.M.L. was telling the truth in the forensic interview where she disclosed Larks' abuse and thus impermissibly bolstered her credibility. To support this, Larks highlights that Eisenhauer testified as an expert in forensic interviewing and as K.M.L.'s interviewer. The jury heard Eisenhauer elicit from K.M.L. a promise to tell the truth in the interviews; thus, says Larks, Eisenhauer's testimony that children are "more likely than not to tell the truth" suggested that K.M.L. was being honest.

¶ 21    While we agree that Eisenhauer's dual role as a lay and expert witness posed a unique risk of bolstering K.M.L.'s credibility, we cannot conclude that the trial court plainly erred.

2.    Applicable Law and Analysis

¶ 22    The parties agree that the issue is unpreserved. We review unpreserved issues for plain error. *People v. Conyac*, 2014 COA

10

8M, ¶ 53. Under this standard, the defendant bears the burden of establishing that at the time the error arose, "it was so clear cut and so obvious that a trial judge should have been able to avoid it without the benefit of objection." *Id.* at ¶ 54. The defendant must also establish that the error "undermined the fundamental fairness of the trial itself, so as to cast serious doubt on the reliability of the conviction." *Id.*

¶ 23    Larks relies on *Venalonzo v. People*, 2017 CO 9, ¶ 32, factually and for the proposition that "witnesses are prohibited from testifying that another witness is telling the truth on a particular occasion." In *Venalonzo*, an expert in forensic interviewing also directly interviewed the child victims of sexual assault. *Id.* at ¶ 35. The expert testified that the children's behaviors during the interview "were common to [those of] other child sex assault victims she had interviewed." *Id.* The Colorado Supreme Court held that the prosecution could introduce videotaped forensic interviews without this testimony and concluded that comparing the victims to other children who experienced sexual assault improperly bolstered the victims' credibility. *Id.* at ¶ 36.

¶ 24    We agree that Larks' case parallels *Venalonzo*, as Eisenhauer also served as a lay and expert witness.  The jury viewed recordings of K.M.L.'s interviews, in which Eisenhauer elicited a promise from K.M.L. to be truthful.  Eisenhauer's statement that she elicits this "because research shows if they promise to tell the truth that they're more likely than not to tell the truth" did little to provide context to the interview and instead implied that K.M.L. was indeed truthful.  *See also People v. Snook*, 745 P.2d 647, 648-49 (Colo. 1987) (testimony that children tend not to fabricate stories of sexual abuse and that they often reproduce their own experience when reporting it amounted to support for the victim's truthful character).  Thus, we agree with Larks that the error was obvious in light of *Venalonzo* and *Snook*.

¶ 25    However, the error did not undermine the trial's fundamental fairness.  *See id.*  Larks effectively cross-examined Eisenhauer on this testimony, both parties asked other lay witnesses about K.M.L.'s character for truthfulness, and other family members' testimony corroborated the alleged instances of abuse.  Significantly, the jury returned a hung verdict on three counts of sexual assault.  The split verdict suggests jurors thoughtfully

12

"parsed the evidence" and were not unduly influenced by Eisenhauer's improper testimony. *People v. Quillen*, 2023 COA 22M, ¶ 39; *see also People v. Larsen*, 2017 CO 29, ¶ 16 (concluding that a split verdict indicates that improper evidence did not influence the jury).

## IV.   Involuntary Psychological Evaluation

¶ 26   Larks next contends that the trial court erred in denying his request for an involuntary psychological evaluation of K.M.L.  We disagree.

### A.   Additional Background

¶ 27   K.M.L. was diagnosed with PTSD in 2018 after disclosing the alleged 2016 sexual assault by a peer, and K.M.L.'s therapist again diagnosed her with PTSD after she disclosed the 2018 sexual assault by Larks.  Before trial, K.M.L. waived her privileges to all mental health records, making therapy and hospitalization documents, including her PTSD diagnoses, available to defense counsel.  A defense-endorsed expert, Alison Osborn, reviewed these records and stated that forming an independent opinion on whether K.M.L. suffers from PTSD required her to conduct her own two-to-four-hour clinical evaluation.  According to Osborn, relying on

13

third-party sources "would limit the reliability and validity" of her opinion. Larks subsequently moved for an order allowing Osborn to conduct a psychological evaluation of K.M.L.

¶ 28 The prosecution countered that the defense had access to K.M.L.'s mental health records, K.M.L. experienced extreme anxiety, and, according to K.M.L.'s therapist, it would likely be "very traumatic for her" to rehash the details of the alleged abuse if a clinician — chosen by Larks — forced her to do so. At a pretrial hearing, K.M.L. "beg[ged]" the court to deny the motion," stating it took her years to open up to her own therapist about the abuse she endured and equating the involuntary evaluation to "rip[ping] [her] soul open to a stranger."

¶ 29 Pursuant to *People v. Chard*, 808 P.2d 351, 355 (Colo. 1991), the trial court balanced the parties' positions and considered whether Larks had a "compelling need" for the evaluation that outweighed the risk of re-traumatizing K.M.L. Because medical records supporting the PTSD diagnosis were available to Larks, the court concluded that Larks had not shown a compelling need for an involuntary evaluation that outweighed the potential risk to K.M.L.'s well-being.

## B.     Applicable Law and Analysis

¶ 30     We review the trial court's denial of a motion for an involuntary psychological examination for an abuse of discretion. *People v. Melendez*, 80 P.3d 883, 888 (Colo. App. 2003), *aff'd*, 102 P.3d 315 (Colo. 2004).  A court abuses its discretion where its decision is manifestly arbitrary, unreasonable, or unfair, or based on a misapprehension or misapplication of the law.  *People v. Ehrnstein*, 2018 CO 40, ¶ 13.

¶ 31     The Colorado Supreme Court stated in *Chard,* "In deciding whether to grant a defendant's motion for the involuntary psychological examination of a child sexual-abuse victim, the court must weigh the defendant's right to a fair trial against the invasion of the victim's privacy."  808 P.2d at 353.  Chard presented affidavit evidence and testimony to support his position that an evaluation was necessary, but the court found that this was undermined by his own testimony.  *Id.* at 354.  On this basis, the supreme court concluded that Chard had not shown a compelling need for the test as it was unlikely to yield material evidence that outweighed possible trauma to the victim.  *Id.*

15

¶ 32    The record before us shows that the trial court considered both parties' positions and balanced them accordingly. The trial court noted it was an "extremely close question," but "there is clearly a prior diagnosis of PTSD," and in light of this, Larks did not meet his burden of showing beyond a reasonable doubt that an independent evaluation was necessary. The court acknowledged Osborn's reluctance to make a PTSD determination without personally evaluating K.M.L., but it stated, "the Court absolutely finds the emotional trauma is unmeasurable to this victim and, quite frankly, the Court has doubts [as] to whether any examination [will] produce material which would ultimately be helpful to the defendant." Accordingly, the trial court denied the motion.

¶ 33    Even if we were to balance these interests ourselves and come to a different conclusion, we cannot say the trial court abused its broad discretion in making its determination; the determination was not arbitrary, unreasonable, or unfair. *Chard*, 808 P.2d at 354; *see also People v. Kriho*, 996 P.2d 158, 177 (Colo. App. 1999) (concluding that while "reasonable minds" could come to a different conclusion than the trial court did, its decision did not rise to an abuse of discretion); *People v. Medina*, 51 P.3d 1006, 1018 (Colo.

16

App. 2001) (conceding that although a piece of evidence had marginal relevance, the reviewing court cannot say that the trial court abused its discretion in admitting it). We therefore conclude that the trial court did not err by denying Larks' motion for an involuntary psychological evaluation of K.M.L.

## V. The Bicycle Incident

¶ 34 Fourth, Larks argues the trial court erred in admitting, as evidence of child abuse, that Larks kicked L.Z.L. down the stairs and rode over her fingers with a bicycle in K.M.L.'s presence (the bicycle incident). Larks claims that this was improper "other act" evidence under CRE 404(b) or, alternatively, unfairly prejudicial under CRE 403. We are not persuaded.

### A. Additional Background

¶ 35 K.M.L. testified that Larks deprived her of sleep and made her stand against a wall as punishment. Larks objected to this testimony on CRE 403 and 404(b) grounds. The court overruled this objection and found that *all* abusive acts K.M.L. experienced or observed during the relevant timeframe were admissible.

¶ 36 The jury heard about the bicycle incident twice: first from K.M.L. during a redacted forensic interview recording and again

when L.Z.L. testified on direct examination. Larks did not object to the recording but objected when L.Z.L. testified about the bicycle incident and Larks' "nonverbal cues when he's angry." The court sustained this objection on relevance grounds but allowed the prosecution to continue questioning L.Z.L. about the abuse K.M.L. witnessed.

¶ 37    Larks now argues on appeal that the bicycle incident constitutes "other act" evidence under CRE 404(b) and that the trial court was required to conduct an analysis under *People v. Spoto*, 795 P.2d 1314 (Colo. 1990). Larks also posits that the testimony was unfairly prejudicial under CRE 403. He maintains that the issue is preserved because he objected on these grounds to K.M.L.'s testimony about sleep deprivation and other forms of punishment and, in overruling that objection, the court remarked that abusive acts K.M.L. observed were admissible. The prosecution counters that the defense objected to different testimony describing different acts of abuse and notes that the court *sustained* the contemporaneous relevance objection Larks made when L.Z.L. testified about the bicycle incident. We conclude that the issue is unpreserved because Larks did not object to L.Z.L.'s testimony on

the same grounds raised in this appeal. *See People v. Ujaama*, 2012 COA 36, ¶¶ 37-38 (to preserve an issue, a party must object at trial on the same grounds asserted on appeal, and with enough specificity to alert the trial court to the issue of which the defendant now seeks review).

## B.     Applicable Law and Analysis

¶ 38     We review unpreserved issues for plain error. *Conyac*, ¶ 53. Under this standard, the defendant bears the burden of establishing that at the time the error arose, "it was so clear cut and so obvious that a trial judge should have been able to avoid it without benefit of objection." *Id.* at ¶ 54. For an error to be obvious, "the action challenged on appeal ordinarily 'must contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law.'" *Scott v. People*, 2017 CO 16, ¶ 16 (quoting *People v. Pollard*, 2013 COA 31M, ¶ 40). The defendant must also establish that the error "undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the conviction." *Conyac*, ¶ 54.

¶ 39     The jury first heard about the bicycle incident from K.M.L. in a redacted forensic interview. The parties agreed not to redact the

bicycle incident from this interview, and Larks did not object when the recording was played. Thus, any conceivable error by the trial court in allowing L.Z.L. to testify about that same incident was not obvious; L.Z.L. was merely discussing evidence made previously available to the jury. *People v. Crabtree*, 2024 CO 40M, ¶ 53 (stating that we must determine whether the error was obvious when committed, not whether it is obvious on appeal); *see also People v. Douglas*, 2015 COA 155, ¶ 41 (concluding that the trial court did not commit plain error in admitting testimony that was cumulative of other properly admitted testimony). Additionally, given the substantial amount of evidence supporting the allegations against Larks, we cannot say this testimony undermined the trial's fundamental fairness or calls into doubt the reliability of Larks' convictions. *Cardman v. People*, 2019 CO 73, ¶ 39 (stating that the question at this step of the plain error analysis is whether a reasonable possibility exists that the error contributed to the conviction).

## VI. Cumulative Error

¶ 40    Finally, Larks contends that even if none of the stated errors individually warrant reversal, the trial court's alleged errors cumulatively prejudiced him and warrant reversal.

¶ 41    We review claims of cumulative error de novo. *Howard-Walker v. People*, 2019 CO 69, ¶ 22. Cumulative error may occur when "[n]umerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial, in which event a reversal would be required." *Id.* at ¶ 24 (citation omitted). Cumulative error may result in reversal when "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process." *Id.* (alteration in original) (citation omitted).

¶ 42    However, cumulative error "requires that numerous errors be committed, not merely alleged." *Conyac*, ¶ 152. Because we conclude that the trial court did not err with respect to any of the contentions we have reviewed, cumulative error did not occur. *See People v. Valdez*, 2017 COA 41, ¶ 51.

## VII. Disposition

¶ 43    For the reasons stated, the judgment is affirmed.

JUDGE MEIRINK and JUDGE HAWTHORNE concur.